[No. S026136. Mar. 18, 1993.]

THE PEOPLE, Plaintiff and Respondent, v.
ENRIQUE CHAVEZ CEJA, Defendant and Appellant.

COUNSEL

Fern M. Laethem, State Public Defender, under appointment by the Supreme Court, Jeanne Wolf and Douglas G. Ward, Deputy State Public Defenders, for Defendant and Appellant.

Daniel E. Lungren, Attorney General, George Williamson, Chief Assistant Attorney General, John H. Sugiyama and Ronald A. Bass, Assistant Attorneys General, Stan M. Helfman and Sharon G. Birenbaum, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

ARABIAN, J.—Defendant was convicted of first degree murder. The jury was allowed to consider two theories of first degree murder: (1) a deliberate

and premeditated killing; and (2) murder by means of lying in wait. The Court of Appeal found insufficient evidence to support the theory of lying in wait and therefore reversed the conviction. We granted review to determine whether there was sufficient evidence of lying in wait and, if not, whether reversal is required in light of the remaining valid theory of first degree murder. (Cf. *People* v. *Green* (1980) 27 Cal.3d 1 [164 Cal.Rptr. 1, 609 P.2d 468] with *Griffin* v. *United States* (1991) 502 U.S. __ [116 L.Ed.2d 371, 112 S.Ct. 466].)

We find that the evidence was sufficient to warrant instructions on lying in wait, and therefore need not decide the second question. (But see *People* v. *Guiton, ante,* p. 1116 [17 Cal.Rptr.2d 365, 847 P.2d 45].)

## I. FACTS

Defendant was convicted of shooting and killing Diana Hernandez (Diana) in the front yard of her brother's home in East Palo Alto on September 7, 1988.

Defendant, known as "Chico," was the father of Diana's infant son. During the summer of 1988, Diana and defendant lived together in a stormy relationship marked by frequent quarrels and occasional separations. About 10 days before the shooting, Diana left defendant and moved into the home of her brother, Hermenegildo Hernandez (Hermenegildo), and his wife, Maria Ortega. About four days before the shooting, Lupe Roque, who also lived at the house, heard defendant talking to Diana through a window. Defendant was not allowed to enter the house. Defendant told Diana to return everything he had given her, including her clothes and jewelry. He said that "if she was going to leave she was going to leave without nothing of his." Diana threw her clothes and shoes out the window.

Two or three days before the shooting, Diana and others went to a laundromat. Defendant followed in his car. Defendant attempted to speak with Diana at the laundromat, but she refused to talk to him. She did allow him to play with the baby outside the laundromat. Later, the two spoke at Hermenegildo's house. Still later, defendant and Hermenegildo spoke at a bar. Defendant, somewhat intoxicated, said he loved Diana and could not understand why she did not want to live with him. He gave Hermenegildo a gold chain to give her. Diana refused to accept the chain and told Hermenegildo to return it to defendant. The night before the shooting, Hermenegildo returned the chain to defendant. Defendant said he would kill himself if Diana did not come back to live with him.

Around 10 a.m. on the morning of the shooting, defendant's father's pickup truck was seen parked next to Hermenegildo's house. There was

evidence that the truck was parked next to the gate to the backyard. Around noon or 12:30 p.m., a social worker, Amada Bruce, arrived at the house and spoke in the living room with Diana, Ortega and Roque. Another occupant, Patricia Sierra, was in a bedroom watching television.

Sometime after Bruce arrived, defendant knocked on the front door. Diana answered. Defendant gave a bag of clothes to either Diana or Sierra. Sierra then returned to her bedroom and resumed watching television. Defendant asked Roque if he could talk with Diana in the backyard. When Diana indicated to Roque that she did not want to go outside, Roque said "no." However, Roque did say they could sit in the front yard. During this time, at defendant's request, Diana got the baby. Diana, defendant, and the baby then went into the front yard. Roque went outside with them, watched them go to a sofa and sit down, then returned to the house.

At some point thereafter, Diana was heard to yell, "No, Chico, no," and call for help. Ortega and Roque rushed outside. Sierra looked out of the bedroom window. Exactly what happened next is disputed. It is clear, however, that after others, including Ortega, had arrived on the scene, defendant shot Diana three times with a handgun, killing her. He then fled on foot. During this time, Bruce, the social worker, dialed "911." She was on the telephone when she heard the shots. The time of the call was 1:13 p.m.

Defendant was arrested a year and a half later in Merced. Although he denied committing the crime, he told the police that he drove his father's pickup truck to Hermenegildo's house the morning of the shooting, and saw Diana briefly. He said he left the truck at the house because it would not start. At trial, he presented an alibi defense which the jury rejected.

## II. DISCUSSION

The Court of Appeal found insufficient evidence to support a first degree murder verdict on a theory of lying in wait. ██ ██ The role of an appellate court in reviewing the sufficiency of the evidence is limited. The court must "review the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence—that is, evidence which is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." (*People* v. *Johnson* (1980) 26 Cal.3d 557, 578 [162 Cal.Rptr. 431, 606 P.2d 738, 16 A.L.R.4th 1255]; see also *Jackson* v. *Virginia* (1979) 443 U.S. 307 [61 L.Ed.2d 560, 99 S.Ct. 2781].)

The same standard applies to the review of circumstantial evidence. (*People* v. *Bean* (1988) 46 Cal.3d 919, 932 [251 Cal.Rptr. 467, 760 P.2d

996].) The court must consider the evidence and all logical inferences from that evidence in light of the legal definition of lying in wait. (See *People* v. *Perez* (1992) 2 Cal.4th 1117, 1124 [9 Cal.Rptr.2d 577, 831 P.2d 1159] [regarding premeditation and deliberation].) But it is the *jury*, not the appellate court, which must be convinced of the defendant's guilt beyond a reasonable doubt. (*People* v. *Bean, supra*, 46 Cal.3d at p. 933.) Therefore, an appellate court may not substitute its judgment for that of the jury. If the circumstances reasonably justify the jury's findings, the reviewing court may not reverse the judgment merely because it believes that the circumstances might also support a contrary finding. (*Ibid.*; see also *People* v. *Perez, supra*, 2 Cal.4th at p. 1126.)[1]

██ "All murder which is perpetrated by means of . . . lying in wait" is first degree murder. (Pen. Code, § 189; see *People* v. *Ruiz* (1988) 44 Cal.3d 589, 613-614 [244 Cal.Rptr. 200, 749 P.2d 854].) The jury was instructed that "murder which is immediately preceded by lying in wait is murder of the first degree. [¶] The term lying in wait is defined as waiting and watching for an opportune time to act, together with [a] concealment by ambush or other secret design to take the other person by surprise, even though the victim is aware of the murderer's presence. [¶] The lying in wait need not continue for any period of time provided its duration is such to show a state of mind equivalent to premeditation or deliberation." (CALJIC No. 8.25 (1989 rev.); *People* v. *Ruiz, supra*, 44 Cal.3d at p. 614; see also *People* v. *Morales* (1989) 48 Cal.3d 527, 555 [257 Cal.Rptr. 64, 770 P.2d 244] [interpreting the special circumstance of lying in wait].)

In a letter brief filed shortly before oral argument, defendant argues that this instruction misstates or omits three elements of lying in wait: "[1] a 'substantial period of lying in wait'; [2] that the attack proceed from a position of advantage; and [3] that the attack follow immediately after the watchful waiting." Although the instruction does not verbatim track our language in *People* v. *Morales, supra*, 48 Cal.3d at page 557, we have repeatedly upheld the instruction, and continue to do so. (*People* v. *Hardy* (1992) 2 Cal.4th 86, 161-163 [5 Cal.Rptr.2d 796, 825 P.2d 781]; *People* v. *Ruiz, supra*, 44 Cal.3d at pp. 613-615.) Defendant's specific claims were not made in *Hardy* or *Ruiz*, but claims (1) and (2) were made and rejected in *People* v. *Edwards* (1991) 54 Cal.3d 787, 821-823 [1 Cal.Rptr.2d 696, 819 P.2d 436] (involving only slightly different language from that used here);

---

[1]As the dissent notes, the issue is whether the trial court should have instructed on lying in wait. But, as the dissent also notes, to decide the issue we must determine whether there was substantial evidence to support a jury verdict based on that theory. Therefore, contrary to the dissent, we are stating and applying the correct standard of review. (*People* v. *Perez, supra*, 2 Cal.4th at pp. 1124, 1126.)

claim (3) was made and rejected in *People* v. *Webster* (1991) 54 Cal.3d 411, 449 [285 Cal.Rptr. 31, 814 P.2d 1273]. As we said in *People* v. *Edwards, supra*, 54 Cal.3d at page 823, "We did not require any particular phraseology in *Morales*, only the substance." The instruction contains the substance of all the legal requirements.[2]

■ The required concealment need not be physical. It suffices if the defendant's purpose and intent are concealed by his actions or conduct, and the concealment of purpose puts the defendant in a position of advantage, from which the fact finder may infer that lying in wait was part of the defendant's plan to take the victim by surprise. (*People* v. *Webster, supra*, 54 Cal.3d at p. 448; *People* v. *Morales, supra*, 48 Cal.3d at pp. 554-555.)

In its essence, the issue here revolves around the occurrences from the time defendant approached the house to the shooting. Resolution of the question requires a close examination of the eyewitness testimony. Six witnesses testified about these events.

(1)  *Patricia Sierra*

Sierra testified that while she was watching television in her bedroom, she heard voices outside. She could not hear the words. They were "just talking" at first, then the voices got louder. At trial, she "d[id]n't know" how long had elapsed from the time she was handed the bag of clothes to the time the voices got louder, but estimated it to be 10 to 20 minutes. About one minute after the voices got louder, Diana "started screaming for help." Diana was screaming for Ortega and others, and saying, "No, Chico, no." Sierra looked out the window, and saw defendant pointing a gun at Diana. "She was screaming and then he shot her" three times. Defendant may have "grabbed her by the hair or by the neck" before he shot her.

---

[2]Lying in wait as a form of first degree murder under Penal Code section 189 should not be confused with the largely similar, but slightly different, special circumstance in which the "defendant *intentionally* killed the victim *while* lying in wait." (Pen. Code, § 190.2, subd. (a)(15), italics added to indicate language differences between the two statutes; see *People* v. *Morales, supra*, 48 Cal.3d at p. 558 [focusing on the difference between the language "while" and "by means of"]; *People* v. *Edelbacher* (1989) 47 Cal.3d 983, 1022 [254 Cal.Rptr. 586, 766 P.2d 1] [similar]; *Domino* v. *Superior Court* (1982) 129 Cal.App.3d 1000 [181 Cal.Rptr. 486] [similar]; *People* v. *Webster, supra*, 54 Cal.3d at p. 448 [focusing on the "intentionally killed" requirement of the special circumstance].) Here, there was no special circumstance allegation, so only lying-in-wait murder is involved. However, we can and do rely on special circumstance cases to the extent, which is substantial, that the two types of lying in wait overlap.

We note that nothing in *People* v. *Hardy, supra*, 2 Cal.4th at pages 163 and 191, should be construed as eliminating the distinction between lying in wait as a form of first degree murder and lying in wait as a special circumstance, or as imposing an intentional murder requirement for lying-in-wait murder.

## (2)  Maria Ortega

Ortega testified that "about fifteen minutes, something like that," after defendant and Diana went to the front yard, she heard loud noises from outside. She heard Diana yelling, "No Chico, no, Chico," and calling for the others. Ortega ran outside, and saw defendant "holding her by the hair." "They were struggling." Ortega "told him something nasty [exactly what was not specified]. I told him to leave her alone, let her go." Then she "saw that he took the gun out," and was "holding it in his hand." She "didn't see where he took it from." He pointed the gun at Ortega, who took refuge behind a tree. Defendant "was struggling with [Diana] and then [Ortega] heard three shots."

## (3)  Amada Bruce

Bruce testified that she arrived at the house "sometime after noontime. It could have been about 12:15, 12:30 sometime." She spoke to the occupants for "about twenty-five minutes before something happened." Diana was called to the door. Then Diana came back to get the baby. Bruce resumed talking to the others. Then she heard someone say something like "he's hurting her." "Shortly after that somebody said call the police, he's hurting her again." All this happened "very fast." There was "so much panic" that Bruce "rushed to the phone and dialed 911." While on the telephone, she heard someone say "he has a gun" and "he's going to kill her." Then she heard two shots. From the time defendant arrived to the time of the shots "seemed quick." It was "[a] few minutes, and I can't really say how many minutes. It seemed like a few minutes; five, something like that." It was not "twenty minutes or something like that."

## (4)  Hermenegildo Hernandez

Hermenegildo testified that he was in the backyard when he heard Diana screaming, "No Chico, no Chico, no Chico." He "thought that they were just fighting." He walked towards the door of the house when he heard three shots.

## (5)  Guadalupe Roque

Roque testified that it was "not too long," "it seemed about five or ten" minutes from the time she saw defendant and Diana sit on the sofa to the time she heard a cry for help. She was talking with Bruce when she heard Diana yell for the others. She ran outside, and saw defendant and Diana "struggling." Defendant pointed a gun at Ortega, who hid behind a tree.

Defendant and Diana "were still struggling." "He laid her head on the sofa and shot her three times in the head."

### (6) Stacey Ashford

Ashford, a neighbor, testified that he heard what he characterized as an "argument" between defendant and Diana, who were about 100 to 200 feet away. He could not understand the words because they spoke Spanish, which he does not understand. He saw the two "fighting." Defendant "hit her numerous times, arguing at her, yelling at her, and knocking her on the ground." Ashford then heard shots, and saw defendant flee with a handgun.

Based on this record, the Court of Appeal found the evidence of lying in wait deficient in three respects. First, it found no evidence of watching and waiting. Second, it found no evidence of a plan or concealed purpose to take the victim by surprise, or, stated slightly differently, to "attack Diana unawares." On this point, the court stated: "Although Diana answered the door when appellant arrived at the house, he did not immediately assault her. Rather, they spent some time talking. Diana then reentered the house and returned with their son, whereupon the three of them visited together for a while. It was only after their meeting escalated into an argument and a physical confrontation and Ortega directed disparaging remarks to appellant, that the shooting occurred. The evidence is more suggestive that the killing was a product of appellant's 'hot anger of the moment and was executed without reflection' rather than the result of any plan, secrecy or concealment. [Citation.]"

Third, the court found no evidence that defendant attacked the victim "from a position of advantage or seclusion." It reasoned that "[a]ppellant had no more advantage over Diana at the time he actually fired the fatal shot than he had at any time during and after they first met at the front door. To the contrary, the fact that appellant shot Diana in Ortega's presence during an argument, rather than while seated alone with her, suggests the killing resulted from anger and provocation rather than from a planned, surprise attack."

██ We disagree that the evidence was insufficient to warrant instructions on lying in wait. Although the Court of Appeal has stated one possible interpretation of the evidence, the jury, which was the finder of fact, could reasonably have interpreted the evidence quite differently. Viewing the record, as we must, favorably to the jury's verdict, we find sufficient evidence, that is, evidence which is reasonable, credible and of solid value, to support each element of lying in wait.

There was evidence of watching and waiting for an opportune time to act. Defendant parked his father's pickup truck next to the house hours before he came to the door. It was not until an outsider, Bruce, came to speak with people in the house, and possibly provide a distraction, that defendant actually asked to see Diana. Moreover, the jury could infer that he waited and watched until his victim was alone with him in the relative isolation of the front yard before he struck.

We also disagree with the second and third perceived evidentiary deficiencies. In essence, the Court of Appeal found, and defendant argues[3], that the evidence can reasonably be interpreted in only one way—that the actual shooting occurred on the spur of the moment after an argument between defendant and Diana escalated into a physical confrontation. The dissent goes so far as to argue that the unspecified "nasty" remark Ortega made to defendant after she heard Diana screaming for help and saw him holding Diana by the hair precipitated the shooting. Although, as the court stated, there is some evidence "suggestive" of that view, that is not the test. A reviewing court may not substitute its judgment for that of the jury. It must view the record favorably to the judgment below to determine whether there is evidence to *support* the instruction, not scour the record in search of evidence suggesting a contrary view. (See *People* v. *Perez, supra,* 2 Cal.4th at p. 1126.)

The Court of Appeal focused on only part of the evidence. The jury also heard testimony of defendant's previous history with the victim, which provided a motive for lying in wait; testimony indicating that defendant waited until the social worker was talking with the occupants before he approached the house, using a bag of clothes as his excuse; that he parked the truck near the gate to the backyard, which the jury could reasonably infer was intended to provide a means of escape after he lured Diana to that yard and shot her there; that he concealed upon his person a *loaded* handgun well before any alleged argument arose; and that he tried to get the victim to accompany him alone to the backyard before having to settle on the front yard (which foiled his plan to escape with the truck). This evidence, generally ignored in the Court of Appeal's analysis, logically supports the inference (*People* v. *Perez, supra,* 2 Cal.4th at p. 1124) that the shooting was not a sudden outburst of provoked passion, but was the culmination of a plan to take his victim by surprise from a position of advantage. The victim's

---

[3]Defendant argues, "If the defendant and the victim engage in activities before the killing not designed to gain a position of advantage, or the defendant passes up several positions of advantage before killing during an argument, there is no lying in wait." The conclusion based upon the assumptions is no doubt correct, but the assumptions are not the only reasonable interpretation of the evidence.

screams for assistance additionally indicate "that she was taken by surprise, and was previously unaware of any plan to harm her." (*People* v. *Morales, supra,* 48 Cal.3d at p. 554.)

The fact that some of the witnesses characterized the words spoken between Diana and defendant immediately before the shooting as an "argument" is not dispositive. The jury could reasonably have interpreted the events as showing, not a dispute, as defendant would have it, or "provocation," as the Court of Appeal termed it, but Diana screaming for help as soon as defendant's murderous scheme became apparent. Indeed, all the evidence regarding the *content* of the words, as distinguished from the tone of voice, showed no dispute but a plea by Diana for mercy from defendant and help from her friends.

Similarly, all the *specific* evidence regarding what some called the "fight" or "struggle" between defendant and Diana, or what the Court of Appeal characterized as a "physical confrontation," showed, not mutual combat, but solely defendant assaulting Diana. There was no evidence that Diana did *anything* confrontational or provocative, but merely sought to defend herself when defendant "grabbed her by the hair or by the neck" (Sierra), was "holding her by the hair" (Ortega), or "hit her numerous times" and "knock[ed] her on the ground" (Ashford). Moreover, the fact that the witnesses generally did not see the gun right away does not establish, as a matter of law, that defendant did not have it ready for use before it was seen. The jury could reasonably infer that defendant displayed the loaded handgun before Diana began struggling and pleading for her life. Finally, that Ortega said something "nasty" to defendant is hardly surprising, or even significant, under the circumstances; to argue as a matter of law that the remark triggered the shooting is to pervert settled rules of appellate review.

Contrary to the Court of Appeal's view, the jury could reasonably find that defendant sought and obtained a position of advantage before he shot Diana. When defendant met Diana at the door, others were nearby. He tried to get her alone in the backyard, near his truck. When that failed, he lured her to the front yard, a "more isolated area" (*People* v. *Morales, supra,* 48 Cal.3d at p. 555; see also *People* v. *Webster, supra,* 54 Cal.3d at p. 448) than the house, although perhaps not as ideal for his purposes as the backyard. It was not, however, until Roque returned to the house after accompanying defendant and Diana to the front yard that defendant was finally alone with his victim. At that point, the jury could reasonably find, defendant seized his advantage, and attacked. That the victim resisted long enough to cry for help, and for others to run out and witness the shooting, does not vitiate the lying in wait.

Defendant contends that the shooting was not "immediately" preceded by the lying in wait. He cites Sierra's estimate that the time between his arrival at the house and the shooting was about 10 to 20 minutes and Ortega's estimate that it was about 15 minutes. He also argues that Bruce's estimates regarding the time she arrived at the house and the length of time that elapsed before defendant arrived, together with the evidence about the time the "911" call was made, established conclusively that "at least *18 minutes* passed between the time that [defendant] arrived and the time of the shooting." He further argues that this length of time between his arrival at the house and the shooting demonstrates that any lying in wait was necessarily interrupted by other events, including, presumably, an argument. We disagree.

This testimony merely presented a jury question. The jury could reasonably have found the time period was shorter than defendant argues. Bruce's estimates regarding the time she arrived at the house, and the length of time that passed before defendant came, were necessarily vague. The jury was not required to treat them as mathematical certainties. Bruce also specifically testified that the events happened "very fast" and that the time from defendant's arrival to the shooting "seemed quick," about five minutes. The jury could reasonably have considered this latter testimony to be the more reliable. Roque also estimated the time between defendant's arrival and the shooting as about five or ten minutes.

The testimony of Bruce and Roque is "other substantial evidence in the case [which] supports a reasonable inference" that the shots were fired soon after the victim was isolated. (*People* v. *Edelbacher, supra,* 47 Cal.3d at p. 1020 [involving a similar conflict in the evidence regarding the elapsed time before the shooting].) Bruce, a neutral outsider, might well have been more persuasive than others who were more emotionally involved, and especially someone like Sierra who had been watching television in a different room.

■ The precise period of time is also not critical. As long as the murder is immediately preceded by lying in wait, the defendant need not strike at the first available opportunity, but may wait to maximize his position of advantage before taking his victim by surprise. In *People* v. *Edwards, supra,* 54 Cal.3d at page 825, we found that evidence from which the jury could infer that the "defendant waited and watched until the [victims] reached the place of *maximum vulnerability* before shooting" supported a finding of lying in wait. (Italics added.)

■ This case is similar. Defendant could have watched and waited until Diana was as isolated as possible, after Roque returned to the house. Any

delay from that point to the shooting can easily be explained by defendant waiting for those inside to resume whatever they were doing, trying to put Diana off her guard, or merely waiting and watching for the best moment to attack. The timing does not necessarily imply that the watching and waiting was interrupted by other events or, to use the language of the Court of Appeal, that the "meeting escalated into an argument and a physical confrontation." The passage of time before the shooting does not, as a matter of law, defeat a finding of lying in wait. (See also *People* v. *Edelbacher, supra,* 47 Cal.3d at p. 1021 ["The brief interval of time which appears to have elapsed between [the victim's] entry into her bedroom and the firing of the fatal shotgun did not make a finding of lying in wait unreasonable since a person concealed in ambush would wait for a clear shot at the intended victim."].)

For these reasons, we find ample evidence to support all the elements of lying-in-wait murder. Instructions on that theory were proper.

### III. CONCLUSION

The judgment of the Court of Appeal is reversed.

Lucas, C. J., Panelli, J., Baxter, J., and George, J., concurred.

**KENNARD, J.,** Concurring.—In his dissent, Justice Mosk argues with some force that the killing in this case was a "tragic fortuity," and that the evidence was insufficient to support a jury instruction on first degree murder perpetrated by lying in wait. I, on the other hand, am of the view that the evidence, although not overwhelming, was sufficient to support the instruction. I therefore agree with the majority that defendant's conviction should be affirmed.

Additional observations are in order. Unlike the bulk of recent decisions in which this court has considered the meaning of the term "lying in wait," this is not a capital case. Here, the prosecution used the lying-in-wait theory only as the basis for a charge of first degree murder.[1] But lying in wait can also be a special circumstance, rendering a criminal defendant eligible for the death penalty. (See Pen. Code, § 190.2, subd. (a)(15) ["The defendant intentionally killed the victim while lying in wait."].) In this case, however, defendant was not charged with this special circumstance.

---

[1]Penal Code section 189 states that any murder "perpetrated by means of a destructive device or explosive, knowing use of ammunition designed primarily to penetrate metal or armor, poison, *lying in wait,* torture, or by any other kind of willful, deliberate, and premeditated killing, or which is committed in the perpetration of, or attempt to perpetrate, [certain enumerated felonies], is murder of the first degree . . . ." (Italics added.) Here, defendant was charged with, and convicted of, murder under this statute.

Unlike first degree murder perpetrated by lying in wait, the lying-in-wait special circumstance must provide a meaningful basis for distinguishing capital and noncapital cases, so that the death penalty will not be imposed in an arbitrary or irrational manner. (See *People* v. *Edelbacher* (1989) 47 Cal.3d 983, 1023 [254 Cal.Rptr. 586, 766 P.2d 1].) Recent decisions of this court have given expansive definitions to the term "lying in wait," while drawing little distinction between "lying in wait" as a form of first degree murder and the lying-in-wait special circumstance, which subjects a defendant to the death penalty. (*People* v. *Hardy* (1992) 2 Cal.4th 86, 161-164, 191 [5 Cal.Rptr.2d 796, 825 P.2d 781]; *People* v. *Webster* (1991) 54 Cal.3d 411, 448-449 [285 Cal.Rptr. 31, 814 P.2d 1273]; *People* v. *Morales* (1989) 48 Cal.3d 527, 553-559 [257 Cal.Rptr. 64, 770 P.2d 244]; *People* v. *Ruiz* (1988) 44 Cal.3d 589, 613-615 [244 Cal.Rptr. 200, 749 P.2d 854].) Constrained by the principle of stare decisis, I concurred in the more recent of these decisions, which were reached after I joined this court. I have a growing concern, however, that these decisions may have undermined the critical narrowing function of the lying-in-wait special circumstance: to separate defendants whose acts warrant the death penalty from those defendants who are "merely" guilty of first degree murder. But because the prosecution in this case did not charge defendant with a lying-in-wait special circumstance, I need not further explore the possible differences between murder by lying in wait and the lying-in-wait special circumstance here.

**MOSK, J.**—I dissent.

In my view, the trial court committed reversible error by instructing the jury as it did on the theories of first degree murder (Pen. Code, § 189) presented by the prosecution.

Let us briefly review the general principles that are applicable on the facts of this case.

A trial court must instruct the jury on every theory that is supported by substantial evidence. (E.g., *People* v. *Glenn* (1991) 229 Cal.App.3d 1461, 1465 [280 Cal.Rptr. 609]; see, e.g., *People* v. *Flannel* (1979) 25 Cal.3d 668, 684-685 (plur. opn. by Tobriner, J.); *id.* at pp. 686-687 [160 Cal.Rptr. 84, 603 P.2d 1] (conc. opn. of Richardson, J.).) Conversely, it may not instruct on any that is not. (See, e.g., *People* v. *Flannel, supra,* at pp. 684-685 (plur. opn. by Tobriner, J.); *id.* at pp. 686-687 (conc. opn. of Richardson, J.).) Evidence is "substantial" if it allows a reasonable jury to make a determination in accordance with the theory presented under the proper standard of proof. (See, e.g., *People* v. *Flannel, supra,* at p. 684 (plur. opn. by Tobriner, J.); *id.* at pp. 686-687 (conc. opn. of Richardson, J.).) As pertinent here, it

must permit the panel to find the elements of first degree murder under the theory in question beyond a reasonable doubt.[1]

At the prosecution's request, the trial court instructed the jury on first degree murder "perpetrated by means of . . . willful, deliberate, and premeditated killing." (Pen. Code, § 189.) I shall assume for argument's sake that the evidence on this theory was substantial.

Also at the prosecution's request, but over defendant's objection, the trial court instructed the jury on first degree murder "perpetrated by means of . . . lying in wait." (Pen. Code, § 189.) On this theory, however, the evidence was not substantial. Individually, the elements require waiting, watching, and concealment. (E.g., *People* v. *Morales* (1989) 48 Cal.3d 527, 554-557 [257 Cal.Rptr. 64, 770 P.2d 244].)[2] Together, they call for the perpetrator to design and execute a "plan" to "put[ ] [himself] in a position of advantage" in order "to take the victim by surprise." (*People* v. *Webster*, *supra*, 54 Cal.3d at p. 448, internal quotation marks omitted.) At trial, there were indeed isolated pieces of evidence that bore on "waiting," "watching," and "concealment" as discrete facts. But, viewed in its entirety, the evidence did not establish an underlying, and unifying, fatal plan. Quite the contrary, it revealed a tragic fortuity. The last encounter between defendant and the victim was similar to many that preceded it during the course of their stormy relationship. It was different in this: Maria Ortega spit a "nasty" remark at defendant. As a consequence, he immediately drew a gun and pointed it at her; she ran behind a tree; and he then turned the weapon against the victim.

---

[1]The question in this case involves instructional error, i.e., whether the theories set out by the trial court were supported by substantial evidence. As a result, the focus of review is on the court. Further, the standard is de novo. (Cf. 2 Childress & Davis, Federal Standards of Review (2d ed. 1992) § 11.29, p. 11-120 [discussing federal appellate procedure as to whether a defense theory is supported].)

The question here does *not* concern the validity of the conviction, i.e., whether the verdict rendered by the jury was supported by substantial evidence. If it did, the focus of review would be on the jury. Also, the standard would be "highly deferential." (Cf. 2 Childress & Davis, Federal Standards of Review, *supra*, § 9.1, p. 9-3 [discussing federal appellate procedure].)

Inexplicably, the majority misapprehend the focus and standard of review. On the very first page of their opinion, they reveal their recognition that the question in this case involves instructional error. But they then proceed as though it concerned the validity of the conviction. As a consequence, they state inapplicable principles and cite inapposite decisions.

[2]I have expressed my view that the element of concealment demands "actual *physical* concealment": "concealment of purpose as distinguished from concealment of the person is not enough." (*People* v. *Hardy* (1992) 2 Cal.4th 86, 222-223, fn. 1 [5 Cal.Rptr.2d 796, 825 P.2d 781] (conc. opn. of Mosk, J.).) My colleagues, however, have not been persuaded. (See, e.g., *People* v. *Morales*, *supra*, 48 Cal.3d at pp. 554-555; *People* v. *Webster* (1991) 54 Cal.3d 411, 448 [285 Cal.Rptr. 31, 814 P.2d 1273] [following *Morales*].) On this point I now concur—under compulsion. (See *People* v. *Hardy*, *supra*, at p. 223, fn. 1 (conc. opn. of Mosk, J.).)

On such facts, a reasonable jury could not have found lying-in-waiting *beyond a reasonable doubt.*

Under the rule of *People* v. *Green* (1980) 27 Cal.3d 1 [164 Cal.Rptr. 1, 609 P.2d 468]—to which I adhere (*People* v. *Guiton, ante,* p. 1116 at pp. 1131-1133 [17 Cal.Rptr.2d 365, 847 P.2d 45] (conc. opn. of Mosk, J.))—the trial court's instructional error requires reversal of the judgment insofar as it convicts defendant on the jury's general verdict finding him guilty of first degree murder. "[W]hen," as here, "the prosecution presents its case to the jury on alternate theories, some of which are legally correct and others legally incorrect, and the reviewing court cannot determine from the record on which theory the ensuing general verdict of guilt rested, the conviction cannot stand." (*People* v. *Green, supra,* at p. 69.)

For the foregoing reasons, I dissent.

Appellant's petition for a rehearing was denied May 13, 1993. Mosk, J., was of the opinion that the petition should be granted.