91 Cal.Rptr.2d 179 (1999)
76 Cal.App.4th 1347
The PEOPLE, Plaintiff and Respondent,
v.
Marquis DAVIS, Defendant and Appellant.
No. D030958.
Court of Appeal, Fourth District, Division One.
December 17, 1999.
Review Denied March 29, 2000.[*]
*182 Robert F. Howell, San Diego, and Doris S. Browning, under appointment by the Court of Appeal, for Defendant and Appellant.
Daniel E. Lungren and Bill Lockyer, Attorneys General, George Williamson and Robert L. Mukai, Chief Assistant Attorneys General, Gary W. Schons and Margaret A. Rodda, Assistant Attorneys General and Robert B. Shaw, Deputy Attorney General, for Plaintiff and Respondent.
McINTYRE, J.
A jury found Marquis Davis guilty of possession of a firearm by a felon, unlawful driving or taking of a motor vehicle, and evading a peace officer with reckless driving. In a bifurcated proceeding, the trial court found Davis had suffered two prior strike convictions under Penal Code section 667, subdivision (b) (all statutory references are to the Penal Code). The court denied Davis's motions for substitution of counsel and for a new trial, and sentenced him to 25 years to life in prison for possession of a firearm by a felon, and to two concurrent terms of 25 years to life for unlawful taking or driving a vehicle and evading a police officer.
Davis appeals, contending that (1) his sentences of 25 years to life pursuant to the three strikes legislation were illegal because his prior two convictions for rape in concert did not qualify as strikes on June 20, 1993; (2) application of the three strikes legislation to him violates his rights to equal protection of the laws; (3) his convictions must be reversed because the prosecutor committed misconduct by inflaming the passions of the jury and arguing facts that were not in evidence; (4) the court erred in instructing the jury with CALJIC No. 2.15 because it lessened the government's burden of proof and relieved the prosecution from having to prove each element of unlawful taking or driving a motor vehicle beyond a reasonable doubt; (5) the court erred by failing to instruct sua sponte on the defense of temporary possession of the shotgun; (6) his conviction for evading a police officer is not supported by substantial evidence; (7) the court erred in denying his motion for a new trial; and (8) the court abused its discretion in denying his motion to substitute counsel.
We reject Davis's contentions for the reasons set forth hereafter and affirm the judgment.

FACTS
On the evening of February 18, 1997, Deputy Sheriff Dawn Anderson saw Davis run a red light at the intersection of South Santa Fe and Escondido Avenue in Vista. Anderson activated the emergency lights of her marked patrol car, and Davis pulled over to the side of the road as if he were going to stop. However, he continued up the hill on Escondido Avenue to another intersection and drove into the bike lane to the right of three cars stopped at the light. Anderson thought Davis was going to make a right turn and then stop, but instead, he rapidly accelerated and crossed in front of the cars that had been stopped at the intersection. Although the posted speed limit was 45 miles per hour, Anderson pursued Davis at speeds up to 70 miles per hour. Davis made a right turn, heading east on Alta Vista Road; however, he was going so fast he ended up traveling in the westbound lane. He then turned into an apartment complex and continued to drive though the alley-ways of the complex at speeds of 25 to 35 miles per hour, which Anderson testified was an unsafe *183 speed for the area. Davis reached a dead-end and fled from the car, entering the apartment of a friend, Mikata Taylor. He was soon apprehended in a closet in Taylor's apartment.
Anderson looked inside the car Davis had been driving and saw a shotgun sitting on the front passenger seat. It was loaded with one shell. When Anderson returned to the sheriffs station, she examined Davis's jacket, and he asked her if she "found the shotgun shells" in the jacket pocket. Anderson had not found any shells, so she radioed a deputy who was still at the apartment complex and asked him to search the area between the car and Taylor's apartment. The deputy did so, and found three shotgun shells.
The car Davis was driving, a Honda Accord, had been stolen less than a month earlier on January 20, 1997. Three people had beaten the owner, taken her car keys and then her car. The owner of the Honda testified at trial that she did not recognize Davis. The hatchback area of the car contained documents addressed to Davis as well as photos of him and his friends, and various items of clothing.
Davis was interviewed by San Diego Police Detective Warren Nolan, who was investigating the robbery in which the Honda had been taken. Davis told Nolan he had gone to a concert at the Sports Arena on February 18, 1997 and had walked across the street to Tower Records afterwards. He noticed someone get out of the Honda and leave the engine running. Davis said he took the car because he needed a ride home. He claimed he first saw the shotgun on the car's floorboards when he stopped for gas, and that he put the three shells in his jacket pocket after sitting on them. Nolan asked Davis "whether or not he would have fingerprints on the shotgun," and Davis replied, "Yes. I picked it up. I may have touched it." Nolan asked Davis if he had recently seen Harlan Tolbert, who Nolan suspected in the robbery of the Honda. Davis said he had seen Tolbert "some time last year" but could not remember exactly when.

Defense
Davis's friend, Anthony Tarpley, testified that he had intended to drive Davis to and from the concert, but because of a mix up, he did neither. Davis testified that originally, he and his wife were going to accompany Tarpley to the concert, but they got into a fight and she stuffed his clothes in trash bags and threw them out on the front lawn. Davis got a ride to Tarpley's house, but Tarpley was not there, so he left his bags of clothes in Tarpley's garage and caught a bus downtown. He then got a ride to the Sports Arena, where he saw Tarpley. Davis told Tarpley that he needed a ride home, but could not find him at the end of the concert.
Davis then went over to Tower Records, where he ran into his friend, Tolbert. Tolbert declined to give Davis a ride, but said he could use his car if he returned it to Southeast San Diego the next morning. Davis drove to a gas station and called Tarpley and Taylor from a pay phone. The gas station lights were very bright, so after he got back in the car, he noticed the barrel of the shotgun sticking out between the passenger door and the passenger seat. He then set off for Taylor's house, stopping first at Tarpley's garage and retrieving his clothes.
Davis said he was driving down a slight hill when the light at the intersection turned yellow; he did not stop because it was raining and the car would skid. When he noticed the patrol car following him, he started to slow down, but had trouble with the stick shift. He had forgotten about the shotgun, then he "heard [the shotgun] slide forward, and ... panicked" because he was on parole. He had been planning to stop when he was in the bike lane on Escondido Avenue, but instead, "hit the gas" as soon as the light turned green. As he turned onto Alta Vista, there were no pedestrians or oncoming traffic. Davis recalled *184 seeing shotgun shells between the driver's and passenger's seats, but said he did not say anything to Anderson about them. Davis did not tell Nolan about borrowing the car from Tolbert because he did not want to be labeled a "snitch."

DISCUSSION

DAVIS WAS PROPERLY SENTENCED UNDER THE THREE STRIKES LEGISLATION BASED ON HIS TWO PRIOR CONVICTIONS OF RAPE IN CONCERT
In December 1992, Davis was convicted of two counts of rape by force and fear while acting in concert with another under sections "261-264.1." Thus, pursuant to the three strikes legislation (§§ 667, subds. (b)-(i), 1170.12, subd. (c)(2)), the court sentenced Davis to three concurrent terms of 25 years to life. Davis contends this was an illegal sentence because his convictions for rape in concert did not qualify as strikes under section 667.5, subdivision (c) or 1192.7 subdivision (c) on June 20, 1993. We disagree, because rape in concert was a serious felony under section 1192.7, both on June 20, 1993 and when Davis committed these offenses.
Section 264.1, enacted in 1967, provides increased punishment for defendants who commit rape while voluntarily acting in concert with another. The statute delineates a more serious form of rape and "exhibits a legislative recognition that rape is even more reprehensible when committed by two or more persons." (People v. Jones (1989) 212 Cal.App.3d 966, 969, 260 Cal.Rptr. 853; see also People v. Champion (1995) 9 Cal.4th 879, 933, 39 Cal. Rptr.2d 547, 891 P.2d 93.)
The three strikes legislation applies to felony convictions which "fit the definition" of a serious or violent felony under sections 1192.7 and 667.5, respectively, as of June 30, 1993. (Gonzales v. Superior Court (1995) 37 Cal.App.4th 1302, 1311, 44 Cal.Rptr.2d 144; § 667, subds. (b) & (d).) Sections 1192.7 and 667 (now § 667, subd. (a)) were enacted as part of Proposition 8 in 1982 to provide sentencing enhancements for repeat offenders who commit serious crimeswhich are enumerated in section 1192.7. (People v. Equarte (1986) 42 Cal.3d 456, 459, 229 Cal.Rptr. 116, 722 P.2d 890.) It is the "criminal conduct" described in section 1192.7 that the voters perceived as dangerous and deserving of extra punishment when committed by recidivists. (People v. Equarte, supra, 42 Cal.3d at p. 463, 229 Cal.Rptr. 116, 722 P.2d 890, original italics.)
When enacted, and on June 30, 1993, section 1192.7, subdivision (c) listed "25 categories which qualified] as `serious felonies.' " (People v. Equarte, supra, 42 Cal.3d at p. 461, 229 Cal.Rptr. 116, 722 P.2d 890, fn. omitted.) One of these categories was (and is) listed as "rape" referencing no specific penal code section or sections. (§ 1192.7, subd. (c)(3).)[1] In 1998, the Legislature added "Any violation of Section 264.1" to section 1192.7 (§ 1192.7, subd. (c)(31), added by Stats.1998, ch. 936, § 13.5.)
Davis contends that rape in concert does not qualify as a strike because although the June 30, 1993 version of section 1192.7 listed rape as a serious felony, it "did not include the element that a rape be committed `in concert.'" He also maintains that the earlier version of the statute could not have been intended by the Legislature to include rape in concert as a serious felony because there would have been absolutely no purpose in amending the statute to add a reference to section 264.1. We reject these contentions.
*185 The focus of the inquiry is on the criminal conduct described in section 1192.7 and not on whether a specific Penal Code section is listed. (People v. Equarte, supra, 42 Cal.3d at pp. 463-464, 229 Cal. Rptr. 116, 722 P.2d 890.) "The essential guilt of rape consists in the outrage to the person and feelings of the victim of the rape." (§ 263.) The requisite act is penetration, no matter how slight. (Ibid.) Under section 264.1, a person who commits rape in concert also commits rapethe conduct the voters perceived as particularly dangerous and deserving of additional punishment. (People v. Best (1983) 143 Cal.App.3d 232, 237, 191 Cal.Rptr. 614; see also People v. Ramirez, supra, 189 Cal.App.3d at pp. 621-622, 236 Cal.Rptr. 404.) The added element of acting in concert with another makes the crime of rape even more heinous and worthy of greater punishment. (People v. Jones, supra, 212 Cal.App.3d at p. 969, 260 Cal.Rptr. 853.) Thus, the information alleged, "as section 264.1 requires," that Davis and another committed rape while acting in concert with each other, and the abstract of judgment indicates that Davis was convicted of "Rape Force/Fear" under sections "261-264.1." (People v. Best, supra, 143 Cal. App.3d at p. 237, 191 Cal.Rptr. 614.) For Davis to suggest that rape in concert could not be a strike because section 1192.7 "did not include the element that a rape be committed in concert" is meritless. (People v. Best, supra, 143 Cal.App.3d at p. 237,191 Cal.Rptr. 614.)
The fact that in 1998 the Legislature added section 264.1 to section 1192.7, subdivision (c) does not help Davis. Section 1192.7 was enacted in 1982 as a result of the electorate approving Proposition 8. Whether 16 years later the Legislature thought the original version of section 1192.7 included rape in concert in the category "rape" or not, is of very little moment. (See People v. Cruz (1996) 13 Cal.4th 764, 781, 55 Cal.Rptr.2d 117, 919 P.2d 731.) Determination of the meaning of statutes is a judicial function, and we interpret the words of the statute in the sense in which they would have been understood at the time of enactment in order to effectuate the purpose of the law. (Id. at pp. 775, 881, 55 Cal.Rptr.2d 117, 919 P.2d 731.) In 1982, the voters perceived certain categories of conduct as particularly dangerous and deserving of extra punishment if committed by recidivists; one of these categories was rape. At that time, section 264.1 designated the crime of rape, committed in concert with another, as even more serious and deserving of greater punishment. (People v. Equarte, supra, 42 Cal.3d at p. 463, 229 Cal.Rptr. 116, 722 P.2d 890.) Thus, the voters clearly intended that rape in concert would be included in the category of criminal conduct "rape." Indeed, they would probably be shocked and amazed by Davis's suggestion otherwise.
Accordingly, we conclude that Davis was properly sentenced to 25 years to life under the three strikes legislation because rape in concert was a serious felony under section 1192.7 on June 30, 1993. Given this holding, we need not decide whether rape in concert was a violent felony under section 667.5, subdivision (d)(3) on that date.

APPLICATION OF THE THREE STRIKES LEGISLATION TO DAVIS DOES NOT VIOLATE HIS RIGHT TO EQUAL PROTECTION
Davis contends the three strikes legislation violates his rights to equal protection of the law because it treats recidivist felons differently, depending on the order in which they committed their crimes. He complains that under three strikes, recidivist felons who have been convicted of three felonies, consisting of two prior strike felonies followed by a non-strike felony receive 25 years to life. On the other hand, other recidivists who commit the same three felonies, only in a different order, for example, are convicted of the non-strike felony first, followed by the two *186 strike felonies, are subject to substantially lower prison terms.
This situation does not deny Davis equal protection of the law. The Legislature may treat recidivists who have committed serious or violent felonies in the past differently than other recidivists and single them out for greater punishment. (People v. Kilborn (1996) 41 Cal.App.4th 1325, 1331, 49 Cal.Rptr.2d 152; People v. McCain (1995) 36 Cal.App.4th 817, 820, 42 Cal.Rptr.2d 779.) As this court stated in McCain:
"The Legislature has seen fit to increase the severity of punishment for recidivists who have committed serious or violent felonies and who again commit felony offenses. Regardless of whether the new crime committed by such persons is serious or `non-serious,' we cannot say harsher treatment for such recidivists is irrational or arbitrary such that it denies them equal protection under the law." (People v. McCain, supra, 36 Cal. App.4th at p. 820, 42 Cal.Rptr.2d 779.)
Accordingly, we reject Davis's equal protection argument.

ALLEGED PROSECUTORIAL MISCONDUCT

Improper Argument
The prosecutor, Karen Doty, indicated that Davis was not a suspect in the January 1997 robbery in which the Honda was stolen, and agreed that she was "only going to be dealing with the event that occurred on the night of the arrest."
One of the things Doty attempted to do during her closing argument was undermine Davis's explanation to Detective Nolan that he came into possession of the Honda only shortly before his arrest when he saw it in the Tower Records parking lot and persuade the jury that Davis had the Honda and possessed the shotgun before he went to the concert. At one point she argued: "What happened was the defendant had the car before he went to the concert. He put his clothes in. He knew the car was stolen because he probably did getit[.]"
Davis's attorney objected, stating "[t]here's been no evidence whatsoever to establish that." The court overruled the objection, stating: "Counsel may draw reasonable inferences from the evidence. The jury will have to determine whether those are reasonable inferences." Doty then resumed her argument:
"Defendant had this car before he went to the concert. He put his clothes in it. No bags. Threw `em in there after his fight with his wife sometime before that. He knew it was stolen because he got it from his friend, his good friend Harlan Tolbert. His home boy Harlan Tolbert. He didn't want Nolan, the detective, to know that Harlan Tolbert had the car before that because the detective might have that additional link to put Harlan Tolbert with the robbery. He didn't want to give up Harlan Tolbert. Didn't want him to have that link to the robbery. In fact, the defendant himself might even be a suspect in the robbery if he admits that he had the car before that."
Davis contends that Doty's argument amounted to misconduct because it was unsupported by the evidence and she implied that Davis had stolen the car in the robbery after acknowledging prior to trial that he was not a suspect in this crime. This contention is unavailing.
Doty did not suggest that Davis had stolen the car in the robbery. Rather, she attacked Davis's explanation of how he came into possession of the car and his claim that he had no knowledge of the shotgun until shortly before he was arrested. Her theory was that Davis got the car from Tolbert before the concert, and that he told Nolan that he jumped in the car when he found it left running in the Tower Records parking lot because he did not want to implicate his friend Tolbert, who was a suspect in the robbery. Indeed, to admit to Nolan that he had this stolen car *187 before supposedly randomly spotting it at Tower Records might implicate himself in the robbery, which would be another reason to lie to Nolan. Doty's argument was a reasonable inference from the evidence. Davis's clothes and personal effects were found in the car; he told the jury that he borrowed the car from Tolbert after the concert, yet he told Nolan that the last time he had seen Tolbert was in the previous year, and that he took the car when he saw it empty with its engine running. Davis also claimed that he had lied to Nolan because he did not want to be labeled a "snitch," which implies that he had prior knowledge of the car having been stolen. Thus, it was not improper for Doty to argue that he got the Honda from Tolbert before the concert and knew it was stolen. (People v. Lewis (1990) 50 Cal.3d 262, 283, 266 Cal.Rptr. 834, 786 P.2d 892.)

Cross-examination Regarding Davis's Rape Convictions
Pursuant to Evidence Code 788, Doty introduced Davis's prior rape convictions for impeachment purposes as follows:
"Q: Mr. Davis, let's talk about how honest you are. You said you've been convicted of rape; is that right?
"A: Yes, ma'am.
"Q: It wasn't just rape, it was forcible rape in concert; is that right?
"A: Yes, ma'am.
"Q: And it wasn't just one count; is that right?
"A: Yes, ma'am.
"Q: Two counts?
"A: Yes, ma'am."
However, when cross-examining Davis regarding his being pursued by police, Doty brought up the rape conviction again:
"Q: And you are concerned about pedestrians and cars out there; is that right?
"A: Yes, ma'am. I have a heart, too.
"Q: Did you have a heart when you raped that girl?"
Davis's attorney objected on the grounds of prosecutorial misconduct. The court sustained the objection and admonished the jury: "Ladies and gentlemen, that remark will be disregarded. That was an improper remark by the prosecutor. You will disregard it."
Davis contends Doty's remark amounted to prejudicial misconduct and the judgment should be reversed. The remark was certainly improper, and we do not condone such conduct by prosecutors. However, it does not warrant reversal in this case. The court promptly admonished the jury to disregard it; the jury already had knowledge of Davis's conviction of two counts of "forcible rape in concert"; and Doty did not delve into the details of the crimes. Accordingly, we conclude that beyond a reasonable doubt, Doty's remark about the rape did not contribute to the verdict. (People v. Bolton (1979) 23 Cal.3d 208, 214-215, 152 Cal.Rptr. 141, 589 P.2d 396.)

CALJIC NO. 2.15
Regarding count 2, unlawful taking or driving a vehicle, the court instructed the jury with CALJIC No, 2.15:
"If you find that a defendant was in conscious possession of recently stolen property, the fact of that possession is not by itself sufficient to permit an inference that the defendant is guilty of the crime of unlawful vehicle taking. Before guilt may be inferred there must be corroborating evidence tending to prove the defendant's guilt; however, this corroborating evidence need only be slight and need not by itself be sufficient to warrant an inference of guilt.
"As corroboration you may consider the attributes of possession, time, place and manner, that the defendant had an opportunity to commit the crime charged, the defendant's conduct, his false or contradictory statements, if any, and other statements he may have made with reference to the property, a false account of how he acquired possession of stolen *188 property, and any other evidence which tends to connect the defendant with the crime conduct."
During deliberations, the jury sent the court a note regarding the third element of unlawful taking or driving a motor vehicle, which is that when the person took or drove the vehicle, he had the specific intent to deprive the owner either permanently or temporarily of her title to or possession of the vehicle. (See Veh.Code § 10851; CALJIC No. 14.36.) The note stated:
"In reference to count 2, element three ... [m]ust the prosecutor prove beyond reasonable doubt that the defendant knew he had or was in possession of stolen property, or is it sufficient that conscious possession be established by slight corroborating evidence?"
After discussing the matter with counsel, the court informed the jury: "In all crimes[,] the burden of proof is on the People to prove all elements of the crime beyond a reasonable doubt." The court reread the elements of unlawful driving or taking a motor vehicle (CALJIC No. 14.36) and stated that specific intent may be shown by the circumstances surrounding the commission of the act (CALJIC No. 2.02). The court then reread CALJIC No. 2.15, and added:
"So that instruction tells you what inferences you may draw from certain evidence. Whatever inferences you do or do not draw, you must be satisfied from all the evidence, and all reasonable inferences from the evidence, that the defendant is guilty beyond a reasonable doubt[.]"
Davis contends the court committed reversible error in giving CALJIC No. 2.15 because it lessened the prosecution's burden of proof and relieved it from having to prove each element beyond a reasonable doubt. We disagree based on the particular facts of this case.
When a defendant is shown to be in possession of recently stolen property, slight corroboration of other inculpatory circumstances which tend to show guilt, supports a conviction for unlawful taking or driving a motor vehicle. (See People v. Gamble (1994) 22 Cal.App.4th 446, 453, 27 Cal.Rptr.2d 451; see also People v. McFarland (1962) 58 Cal.2d 748, 754-755, 26 Cal.Rptr. 473, 376 P.2d 449.) CALJIC No. 2.15 sets out this rule, and creates a permissive inference that the defendant knew of the tainted nature of the propertyone a jury may credit or reject depending on the evidence; it does not relieve the prosecution of its burden of establishing guilt beyond a reasonable doubt. (People v. Gamble, supra, 22 Cal. App.4th at pp. 453-454, 27 Cal.Rptr.2d 451.)
The instruction is mischievous, however. For example, it is not clear from its language whether the defendant must simply know he or she is in possession of an item that turns out to be stolen, or whether the defendant must also know that the item is stolen. The term "recently stolen" is not precise in describing the time period between the theft and the possession. In addition, the instruction can cause confusion regarding the prosecution's burden of proofwhich led to the jury's question in this case. However, here, as a result of this question, the court reiterated and emphasized that the prosecution had the burden of proving each element of an offense beyond a reasonable doubt, and that whatever inferences the jury may or may not draw, it had to be satisfied that Davis was guilty beyond a reasonable doubt. Accordingly, we conclude it was not reasonably likely that the jury convicted Davis on a standard less than proof beyond a reasonable doubt. (See People v. Haskett (1990) 52 Cal.3d 210, 235, 276 Cal.Rptr. 80, 801 P.2d 323.)

THE TRIAL COURT DID NOT ERR IN FAILING TO INSTRUCT SUA SPONTE ON TEMPORARY POSSESSION OF THE SHOTGUN
Davis contends that the court should, on its own motion, have instructed *189 the jury on the defense of temporary possession of the shotgun. We disagree because such instruction was unwarranted by the evidence.
The temporary possession doctrine provides that possession is not unlawful where all the following conditions are met: (1) the possession is momentary and based on neither ownership, nor the right to exercise control over the item; (2) the item is possessed solely for the purposes of abandonment, disposal or destruction; (3) the item is possessed for the purpose of terminating the unlawful possession of it by another person or preventing another from acquiring possession of it; and (4) control is not exercised over the item for the purpose of preventing its imminent seizure by law enforcement. (People v. Hurtado (1996) 47 Cal.App.4th 805, 811, 814, 54 Cal.Rptr.2d 853.)
Here, even if we assume that the defense of temporary possession is available to the offense of being a felon in possession of a firearm (see People v. Pepper (1996) 41 Cal.App.4th 1029, 1038, 48 Cal. Rptr.2d 877), substantial evidence does not support such an instruction. There is simply no evidence that Davis possessed the shotgun momentarily and solely for the purposes of abandoning it in order to terminate or prevent another's possession of it. According to Davis's own version of the facts, he spotted the gun at the gas station when he returned to the car after using the pay phone. Despite his status as a felon, he started the engine, pulled out of the gas station and drove up to Tarpley's house, not to dispose of the gun, but to pick up his clothes. Then he set off for Taylor's apartment, but forgot about the gun until he started to pull over in response to Deputy Anderson and the gun slid forward from underneath the passenger seat. These facts do not indicate any intent to abandon the shotgun to terminate or prevent possession of it by another. At best, they reflect someone knowingly driving around with a shotgun. Therefore, there was no error in failing to instruct on temporary possession of the shotgun. (People v. Hurtado, supra, 47 Cal.App.4th at pp. 814-815, 54 Cal.Rptr.2d 853; People v. Sullivan (1989) 215 Cal.App.3d 1446, 1453, 264 Cal.Rptr. 284.)

DAVIS'S CONVICTION FOR EVADING A PEACE OFFICER IS SUPPORTED BY SUBSTANTIAL EVIDENCE
Davis contends that his conviction for evading a peace officer with reckless driving must be reversed because there is no evidence that he drove with a willful or wanton disregard for the safety of other persons or property. The contention is meritless.
The evidence is that Davis attempted to elude Deputy Anderson by driving in the rain at excessive, unsafe speeds both on public roads and through a residential apartment complex. He sped in front of three cars from the right hand bike lane of an intersection. He made a turn onto Alta Vista at such an unsafe speed that he ended up in the opposite traffic lane. There were also cars parked all along the curb on Alta Vista in front of the apartment complex he turned into. That Davis was aware of road conditions and the hazard posed by his behavior is evinced by his testimony that he did not stop for a yellow light at the intersection of South Santa Fe and Escondido Avenue, because it was raining and his car would skid. This is substantial evidence supporting Davis's conviction for evading a peace officer with reckless driving. (People v. Johnson (1980) 26 Cal.3d 557, 578, 162 Cal.Rptr. 431, 606 P.2d 738; see also People v. Ceja (1993) 4 Cal.4th 1134, 1138-1139, 17 Cal. Rptr.2d 375, 847 P.2d 55.)

THE COURT DID NOT ERR IN DENYING DAVIS'S MOTION FOR A NEW TRIAL
Davis moved for a new trial on the grounds of newly discovered evidence based on the unsigned declaration of Serena Telleria. The declaration stated that *190 Telleria and a friend had attended the same concert as Davis and afterwards had gone over to Tower Records. The two women saw Davis in the parking lot and talked for a few minutes. Davis told them he needed to go to Escondido and asked for a ride. They declined since they did not know him, but then another man approached Davis and offered to loan him his car. As he left, Davis gave Telleria his phone number. She called it a few times because she "wondered how it had worked out for him" but was told he was not there. Telleria married and moved to Virginia, but she "ran across the number and was again curious about what had happened." She called, spoke to Davis's brother, and learned that Davis had been convicted of driving a stolen vehicle. Telleria then called Davis's attorney, Barbara McDonald, who prepared the declaration based on Telleria's story.
McDonald read the declaration to Telleria over the phone, and she agreed it was accurate. McDonald faxed Telleria the declaration along with a self-addressed, stamped envelope, but Telleria never returned a signed, notarized copy. McDonald tried several times over a three- to four-week period to speak with Telleria and left many messages, but to no avail. Doty and an investigator from the district attorney's office also tried for a month to contact Telleria with no success.
The court decided to proceed with the hearing as if the declaration were signed. It denied the motion for new trial, finding that Telleria's proposed testimony was not credible and was unlikely to result in a different outcome on retrial. The court found it implausible that a person who had married and moved across the country would call long distance to satisfy her curiosity about the loan of a car a year earlier to a person she had met for only 5 minutes. The court also found it troubling that Telleria did not respond to letters and phone calls from the district attorney, and concluded there was no showing that Telleria would come to San Diego for a retrial.
We uphold this ruling. "The determination of a motion for a new trial rests so completely within the court's discretion that its action will not be disturbed unless a manifest and unmistakable abuse of discretion clearly appears." (Jiminez v. Sears, Roebuck & Co. (1971) 4 Cal.3d 379, 387, 93 Cal.Rptr. 769, 482 P.2d 681.) When a motion for new trial is based on newly discovered evidence, that evidence must be "such as to render a different result probable on a retrial of the cause[.]" (People v. Sutton (1887) 73 Cal. 243, 247, 15 P. 86.) The court may consider credibility as well as materiality of the proposed evidence in making this determination. (People v. Delgado (1993) 5 Cal.4th 312, 329, 19 Cal.Rptr.2d 529, 851 P.2d 811.)
Here, the implausible nature of Telleria's proposed testimony, coupled with her complete failure to respond to the many attempts by both the district attorney's office and McDonald to contact her amply support the trial court's determination that a different result on retrial was not likely. The court's denial of Davis's new trial motion was well within its discretion.

THE COURT PROPERLY DENIED DAVIS'S MOTION TO SUBSTITUTE COUNSEL
In a closed hearing, after the jury had returned its verdict, Davis asked the court to provide him with a new attorney. He stated that he and McDonald had a conflict of interest and that she "doesn't represent me or my views involved in this case." He complained that McDonald had "disrespected [him] mentally and legally as a client." He also said she was not loyal to him, did not meet with him enough and "didn't take all necessary actions to preserve [his] rights."
The court asked Davis to elaborate, and during a lengthy inquiry into the matter, Davis stated that McDonald: (1) had not subpoenaed "character witnesses" who would explain that he had borrowed their cars in the past; (2) did not put his "star *191 witness" on the stand, although he acknowledged he knew this witness would testify that he had told her to lie; (3) did not cross-examine the police aggressively enough; (4) did not find out how the bags which contained his clothes could have been missing from the Honda; (5) did not file motions to dismiss some of his charges; (6) did not adequately investigate the scene of the apartment complex, and perhaps lied when she said she visited the complex; (7) swore at him, saying that she did not "give a shit" in response to something he said, and responded "bullshit" when he told her she did not adequately investigate the apartment complex; (8) did not bring up the fact that his fingerprints were not found on the gun; (9) did not make enough of the fact that although the police said they found the gun on the front seat, it probably would have fallen off during the car chase. Davis also said that he, and the "majority of inmates," got "funny vibes" about how public defenders represent their clientsthat they tried to make deals too much, and complained that McDonald had suggested trying to make a deal in his case.
The court asked McDonald to respond to each of Davis's complaints, which she did, thoroughly opposing the motion. The court denied Davis's request for substitution of counsel. It found that McDonald's suggestion that he make a deal with the district attorney's office was not a sign of disloyalty, but was good advice based on a realistic assessment of the case. The court found that Davis's other complaints involved questions of strategy and tactics in the trial, and that McDonald had made sound decisions in this regard and had done a thorough investigation.
Davis contends the court so abused its discretion in denying his motion to substitute counsel, that his rights to effective assistance of counsel were violated. He complains that the court did not adequately inquire regarding his complaint that McDonald was not loyal, and did not specifically ask McDonald if she were willing and able to act as a conscientious, diligent advocate for Davis; erroneously relied on McDonald's past courtroom performances; and failed to recognize that in opposing his motion, Davis was acting in her own interest and had a conflict of interest that required the appointment of substitute counsel. We conclude the trial court was well within its discretion in denying Davis's motion to substitute counsel.
"When a defendant moves for substitution of appointed counsel, the court must consider any specific examples of counsel's inadequate representation that the defendant wishes to enumerate. Thereafter, substitution is a matter of judicial discretion. Denial of the motion is not an abuse of discretion unless the defendant has shown that a failure to replace the appointed attorney would `substantially impair' the defendant's right to assistance of counsel." (People v. Webster (1991) 54 Cal.3d 411, 435, 285 Cal.Rptr. 31, 814 P.2d 1273.) Our review of the record reveals that Davis's complaints of McDonald's purported lack of loyalty and "disrespect" were due to her disagreeing with, and declining to implement, Davis's dubious trial strategies, which is not grounds for substitution of appointed counsel. (People v. Barnes (1983) 146 Cal.App.3d 663, 667, 194 Cal.Rptr. 317, disapproved on other grounds in People v. Ortiz (1990) 51 Cal.3d 975, 981-983, 275 Cal.Rptr. 191, 800 P.2d 547.) The record also reveals that the trial court did not base its ruling on McDonald's past performances. The court cited her lengthy experience as part of explaining to Davis how and why her trial strategies were wiser than his.
The court also properly asked McDonald in the closed hearing to respond to each of Davis's complaints, and she properly explained her thoughts, decisions and recollection of events. (See People v. Webster, supra, 54 Cal.3d at pp. 435-436, 285 Cal. Rptr. 31, 814 P.2d 1273; People v. Penrod (1980) 112 Cal.App.3d 738, 747, 169 Cal. Rptr. 533.) The cases cited by Davis for the proposition that McDonald's opposition to the motion created a conflict of interest and left him without adequate representation are inapposite. In U.S. v. Wadsworth *192 (9th Cir.1987) 830 F.2d 1500, 1510-1511, the client filed a motion for substitution of counsel and for continuance on the eve of trial because his court-appointed counsel did not prepare a defense. The attorney acknowledged he "quit," but claimed it was because "he had `not received one bit of cooperation from [his client] in any respect'[.]" (Id. at p. 1507.) The court told the client he could represent himself and would have to go to trial the next day. (Id. at p. 1509.) The Ninth Circuit reversed, holding that the trial court should have suspended proceedings and appointed substitute counsel, who "would have undoubtedly pointed out to the court that the defendant was not responsible for [his attorney's] failure to file a timely motion for a substitution [of counsel] or to prepare for trial." (Id. at p. 1511.) In U.S. v. Gonzalez (9th Cir.1997) 113 F.3d 1026, 1029, the Ninth Circuit held the district court created a conflict between the client and his appointed counsel when the court considered the request for substitution during the client's sentencing hearing and invited the attorney in open court to "contradict his client and to undermine his veracity[.]" In contrast, here, the court conducted its inquiry in a closed hearing out of the presence of the district attorney, and McDonald's responses revealed not only her sound strategy choices but her commitment to conducting the best possible defense and representation for Davis.
Accordingly, we affirm the court's denial of Davis's request for substitution of counsel.

DISPOSITION
The judgment is affirmed.
BENKE, Acting P.J., and HUFFMAN, J., concur.
NOTES
[*] In denying review, the Supreme Court ordered that the opinion be not officially published. (See California Rules of CourtRules 976 and 977.)
[1] Davis states that the June 1993 version of section 1192.7 subdivision (c)(3) listed "rape as defined in subdivision 2 of Section 261" as a serious felony This is not the case. Section 667.5, subdivision (d)(3) referred to "Rape as defined in subdivision 2 of Section 261" as a violent felony, but section 1192.7, subdivision (c)(3) regarding serious felonies referred simply to "rape."