Filed 6/6/14  P. v. Montalbo CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>MARIO MOSES MONTALBO et al.,<br><br>    Defendants and Appellants. | H038197<br>(Santa Clara County<br>Super. Ct. No. C1070383)<br><br>ORDER MODIFYING OPINION<br>AND DENYING REHEARING<br><br>[NO CHANGE IN JUDGMENT] |

THE COURT:

It is ordered that the opinion filed herein on June 2, 2014, be modified as follows:

1.      On page 14, the second full paragraph, beginning "Defendants argue that the trial cout prejudicially erred" is deleted and the following paragraph is inserted in its place:

Defendants argue that the trial court prejudicially erred in instructing the jury in CALCRIM No. 400 that an aider and abettor and the perpetrator are "equally guilty" and in responding to the jury's notes concerning aiding and abetting.

There is no change in the judgment.

Appellant Montalbo's petition for rehearing is denied.

_____          _____

Date                                    Mihara, J.


                                        _____

                                        Premo, Acting P. J.


                                        _____

                                        Grover, J.

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>MARIO MOSES MONTALBO et al.,<br><br>    Defendants and Appellants. | H038197<br>(Santa Clara County<br>Super. Ct. No. C1070383) |

Defendants Mario Moses Montalbo and Valentin Mata were convicted by jury trial of two counts of assault with a deadly weapon (Pen. Code, § 245, subd. (a)(1)).[1]  The jury found true that Mata had personally inflicted great bodily injury (§ 12022.7, subd. (a)) on one of the two victims and found not true an allegation that Montalbo had personally inflicted great bodily injury on the other victim.  The court found true allegations that Montalbo had suffered prior strike (§§ 667, subds. (b)-(i), 1170.12) and serious felony (§ 667, subd. (a)) convictions and had served a prison term for a prior felony conviction (§ 667.5, subd. (b)).  Mata was sentenced to six years in prison, and Montalbo was sentenced to 25 years to life consecutive to a five-year determinate term.

---

[1]    Subsequent statutory references are to the Penal Code unless otherwise specified.

On appeal, defendants challenge the sufficiency of the evidence and contend that the trial court prejudicially erred in instructing the jury on aiding and abetting and in responding to the jury's questions regarding aiding and abetting. Defendants also challenge the court's imposition of criminal justice administration fees. We reject their contentions and affirm the judgments, but we direct the trial court to prepare an amended abstract of judgment for Montalbo to correct a clerical error.

## I. Facts

At about 1:00 a.m. on February 20, 2010, Jeffrey Aana and Yusuf Ali Smith left a bar at Third Street and East Santa Clara Street in downtown San Jose and headed west on East Santa Clara Street toward Aana's car, which was parked near Santa Clara Street and San Pedro. As they passed 75 East Santa Clara Street, they encountered a group of three Hispanic men and two Hispanic women walking toward them from the opposite direction. One of the women asked if they had a lighter, and Aana said "No. I don't smoke." One of the men in the group responded: "'Fuck you then, nigger'" or "[p]unk-ass nigger." Smith is African-American, and Aana is Hawaiian/Filipino. Smith turned around and said "'Excuse me? What?'" "'What did you say?'" A portion of this first encounter between Smith and Aana and the group of five was captured on video by a surveillance camera.

A short man with closely cropped hair and a thick build who was wearing a long-sleeved white sweater approached Smith, repeated his comment, and tried to punch Smith. Smith avoided the punch and punched the man, who was Montalbo. Smith proceeded to fight with "a taller dude" who was slender and whom Smith subsequently

2

identified as Mata.[2]  When one of the women interjected herself, Smith hit her in the face, and she fell to the ground.  The third man, who did not engage in the fight with Smith, was shorter and thinner than Montalbo and was wearing a hat.  Aana was not hit during the fistfight, which was "broken up . . . within seconds."  Smith was also uninjured in the fight.  Aana and Smith resumed walking toward Aana's car.  After Aana and Smith walked away, the video showed the group of five gathering together and apparently conversing before reversing their direction and following Aana and Smith.  A group of police officers was nearby, and their attention was drawn to the commotion.  When the police approached, they saw three or four men run westbound across Second Street toward First Street, which was the direction in which Smith and Aana had gone.

Right after Smith and Aana crossed Second Street toward First Street, they heard yelling behind them and turned and saw the three men running "[f]ull speed" toward them from behind.  Aana backed up into a doorway so that he could protect himself.  Smith was on the street side of the sidewalk near 35 East Santa Clara Street.  Two of the men approached Aana, and he felt something hit his chest.  One of them grabbed Aana's arms and said "'I got you.  I got you.'"  Meanwhile, Montalbo ran up to Smith, and he and Smith began hitting each other.  Montalbo fell over, and then Mata, who had been over by Aana, "just lunged into" Smith.  Smith hit Mata, and Mata fell over.  Montalbo then "threw his body into" Smith.  Smith did not see any weapons and did not feel himself being stabbed at any point during this fight.  Smith did feel Montalbo punch him in the chest in the same location where he subsequently noticed he had a stab wound.  Smith had no contact with the third man (the one who was short and thin and wearing a hat).

---

[2]    Montalbo would never be described as tall or slender.  A surveillance video showing him leaving the scene depicts him as a stocky man of medium height.  The evidence at trial established that Mata was taller and significantly thinner than Montalbo.

Police officers in the area noticed this second fight. A police officer saw Montalbo punch Smith in the center of his upper chest with his right hand, and he heard a "clinking sound" on the ground like something heavy and metal was being thrown on the ground. He yelled at the men to stop, and they separated. A Hispanic woman nearby with a bloody cut on her face told the officer that Smith had hit her and that Montalbo was helping her. Montalbo was wearing a white long-sleeved shirt. Montalbo embraced the woman. The officer told Montalbo to move away, and Montalbo left eastbound. Aana noticed blood dripping from his body and realized that he had been stabbed. The two men who had confronted Aana had "disappeared." Aana told a police officer that he had been stabbed and that a Hispanic man wearing a white shirt had a knife. Smith thereafter realized that he had been stabbed in the left side of his chest and that his neck had been slashed.

When the police realized that Smith and Aana both had stab wounds, they pursued Montalbo and took him into custody. Smith identified Montalbo at the scene of the stabbings as the short, thick man he had been primarily fighting. Mata was stopped by police nearby as he was walking away from the scene of the stabbings. His right hand was bleeding profusely from a cut on his thumb, and his clothing was covered in blood. He told the police that a black man had punched him in the face. A folding knife with Mata's blood on it was found in the corner of a doorway at 35 East Santa Clara Street. There was also blood on the ground and on the wall at that location. Aana's DNA was not detected on the knife. Mata's DNA was on the handle, blade, and tip of the knife. Smith's DNA was found in bloodstains on Montalbo's shirt.

Both Aana and Smith were taken to the hospital. Aana had a wound in the left side of his chest that was six inches long and had caused his lung to collapse. His wound required surgery, and he was hospitalized for several days. Smith's wounds, while less serious, had also caused his lung to collapse. His wounds were stapled closed, and he

4

was released from the hospital after two hours. Smith identified Mata at the hospital as the taller, thinner man who also had been fighting him.

## II. Procedural Background

The prosecution's theory at trial was that Mata had stabbed Aana, Montalbo had stabbed Smith, and they had each aided and abetted the other's assault with a deadly weapon.

Montalbo's trial counsel objected to aiding and abetting instructions on the ground that there was insufficient evidence to show that, if Montalbo was not the stabber, he knew that the perpetrator intended to commit a stabbing. He conceded that if the jury found that Montalbo stabbed Smith there would be sufficient evidence to find that Montalbo aided and abetted the stabbing of Aana. Mata's trial counsel joined in this objection. The court found that there was sufficient evidence to support the aiding and abetting instructions (CALCRIM Nos. 400 and 401). Both defendants also objected on the same basis to the instruction on the natural and probable consequences theory (CALCRIM No. 403). The court overruled the objections.

The court instructed the jury: "You must separately consider the evidence as it applies to each defendant. You must decide each charge and allegation for each defendant separately." The jury was instructed with CALCRIM No. 400: "A person may be guilty of a crime in two ways. One, he or she may have directly committed the crime. I will call that person the perpetrator. Two, he or she may have aided and abetted a perpetrator, who directly committed the crime. A person is [equally] guilty of the crime whether he or she committed it personally or aided and abetted the perpetrator who committed it. [¶] [Under some specific circumstances, if the evidence establishes aiding and abetting of one crime, a person may also be found guilty of other crimes that occurred during the commission of the first crime.]" (Brackets in original.)

5

It was also instructed with CALCRIM No. 401: "To prove that the defendant is guilty of a crime based on aiding and abetting that crime, the People must prove that: [¶] 1. The perpetrator committed the crime; [¶] 2. The defendant knew that the perpetrator intended to commit the crime; [¶] 3. Before or during the commission of the crime, the defendant intended to aid and abet the perpetrator in committing the crime; [¶] AND [¶] 4. The defendant's words or conduct did in fact aid and abet the perpetrator's commission of the crime. [¶] Someone *aids and abets* a crime if he or she knows of the perpetrator's unlawful purpose and he or she specifically intends to, and does in fact, aid, facilitate, promote, encourage, or instigate the perpetrator's commission of that crime."

The jury was instructed with CALCRIM No. 403 on the natural and probable consequences theory. "To prove that the defendant is guilty of Assault with a Deadly Weapon under the Natural and Probable Consequences theory, the People must prove that: [¶] 1. The defendant is guilty of Assault; [¶] 2. During the commission of Assault, a coparticipant in that Assault committed the crime of Assault with a Deadly Weapon; [¶] AND [¶] 3. Under all of the circumstances, a reasonable person in the defendant's position would have known that the commission of the Assault with a Deadly Weapon was a natural and probable consequence of the commission of the Assault. [¶] . . . [¶] A *natural* and *probable consequence* is one that a reasonable person would know is likely to happen if nothing unusual intervenes. In deciding whether a consequence is natural and probable, consider all of the circumstances established by the evidence. If the Assault with a Deadly Weapon was committed for a reason independent of the common plan to commit the Assault, then the commission of Assault with a Deadly Weapon was not a natural and probable consequence of Assault." The jury was also instructed on simple assault as a lesser included offense of assault with a deadly weapon.

Montalbo's trial counsel argued to the jury that there was no evidence that Montalbo knew that weapons would be used. He also argued that a stabbing was not a

natural and probable consequence of a simple assault because there was no evidence that Montalbo knew either of the other men had a weapon. He argued that one of the other two men had stabbed both Smith and Aana. "I'm not saying Mr. Montalbo's not involved. . . . What I'm arguing is there's no evidence that Mr. Montalbo signed up for a stabbing." "He did hit Mr. Smith."

Mata's trial counsel argued that the knife did not implicate Mata in the stabbing of Aana, despite Mata's blood and DNA on the knife, because none of Aana's DNA was found on the knife. He also argued that Mata was not the taller man fighting with Smith because Smith had described that man as being a few inches taller than Mata actually was. Mata's trial counsel argued that the knife had not been proven to be connected to either stabbing, and the third man had not been accounted for. He theorized that, during the altercation, Mata had been cut by someone else with the knife. Mata's counsel argued that Mata had not even committed a simple assault.

The prosecutor addressed the natural and probable consequences theory during his closing argument: "Well, with natural and probable consequences, with that theory, you don't have to prove or find that the person, the defendant, knew that the other participant in the crime of assault had a weapon. You don't have to make that finding." Defense counsel objected, and the court sustained the objection. However, the prosecutor immediately proceeded to argue pretty much the same thing without objection. "Ladies and gentlemen, take a look at the instruction number 403 about natural and probable consequences. There's nothing in there that says I have to prove to you that the defendants, Mario Montalbo or Valentin Mata, actually knew that their coparticipants possessed a deadly weapon. The knowledge element relates to what a reasonable person would foresee in terms of a probable consequence to the commission of a simple assault."

The jury deliberated for two days. During its deliberations, the jury sent out a series of six notes. The first two sought read backs of the testimony of Aana and Smith about the second fight, and the read backs were provided. The third note said: " 'The

7

crime of assault is a lesser included offense of the crime of assault with a deadly weapon.' [¶] Can this statement be clarified and explained to the jury." The court responded by suggesting that the jury look at three instructions: an attached jury instruction "regarding lesser included offenses" that was taken from CALJIC No. 17.11, CALCRIM No. 875 on the elements of assault with a deadly weapon, and CALCRIM No. 915 on the elements of simple assault. Defense counsel agreed to this response.

The jury's fourth note asked: "1. Will aiding and abetting automatically give both defendants the greater crime? [¶] 2. CALCRIM 875 #1-5 describes assault w/a deadly weapon, with this information how do we include or use the rules for aiding & abetting." The court responded: "1. I am not sure what you are asking in question 1. Could you please clarify. [¶] 2. When deciding if the defendant is guilty as a direct perpetrator of the crime charged, refer to CALCRIM #875. When deciding if a defendant is guilty as an aider and abettor of the charged crime refer to CALCRIM #401. When reading the term 'the crime' when referred to in elements #1 through #4 of CALCRIM #401 it means the crime of ASSAULT with a DEADLY WEAPON. When reading the term 'perpetrator', it means the person or persons who personally used a deadly weapon." Although both defense counsel had suggested that the court answer the first question "no" in addition to seeking clarification, they agreed to the court's response.

The jury's fifth note said: "If we decide one defendant is guilty and believe another person is guilty of a lesser offense, does the person of the lesser offense have to be charge [*sic*] the same as the other defendant because of CALCRIM 400 'two, he or she may have aided and abettor [*sic*] a perpetrator, who directly committed the crime. A person is equally guilty of the crime whether he or she committed it personally or aided & abetted. . . . [¶] 2. Can defender [*sic*] be found guilty on the greater charge, if the defender [*sic*] aided and abetted the perpetrator?" The court responded to this note: "1. Please see CALCRIM 200—'Some of these instructions may not apply, depending on your findings about the facts . . . . After <u>you</u> have decided what the facts are, follow the

8

instructions that do apply to the facts as you find them.' [Emphasis Added] So if you find that CALCRIM 400 applies to the facts as you find them, follow this instruction. [¶] 2. Yes. See CALCRIM 400." (Brackets in original.) All counsel agreed to this response.

The jury's final note read: "Question #1 about Calcrim 403. [¶] Item #3 'Under all of the circumstances, etc etc etc . . . .' Question is if the defendant (as stated in item #1) is required to know that the coparticipant had weapon? [¶] Question #2 is about calcrim 401 pg 102. [¶] Item #2 states 'The defendant <u>knew</u> that the Perpetrator intended to commit the crime.' Can you please expand on the definition of the word '<u>knew</u>'. [¶] Question #3 is follow up to question #2. Does the defendant have to know that the Perpetrator had a weapon?"

The court's response to the final note was: "1. No. It is not required that defendant actually know that the coparticipant had a weapon. So long as you find Assault With A Deadly Weapon was a natural and probable consequence of Simple Assault. [¶] In determining whether a consequence is 'natural and probable,' you must apply an objective test, based not on what the defendant actually intended, but on what a person of reasonable and ordinary prudence would have expected was likely to occur. The issue is to be decided in light of all of the circumstances surrounding the incident. A 'natural' consequence is one which is within the normal range of outcomes that may be reasonably expected to occur if nothing unusual has intervened. 'Probable' means likely to happen. [¶] 2. Calcrim 401 requires that the defendant actually know that the perpetrator intended to commit the crime of Assault with a Deadly Weapon. [¶] 3. No. Calcrim 401 requires knowledge of the perpetrator's intent to commit an Assault with a Deadly Weapon." All counsel agreed to this response.

The jury found both defendants guilty of both charged counts of assault with a deadly weapon. It found not true the allegation that Montalbo had personally inflicted great bodily injury on Smith but true the allegation that Mata had personally inflicted

9

great bodily injury on Aana. The prior conviction and prison prior allegations had been bifurcated, and Montalbo had waived his right to a jury trial on them. The court found those allegations true. Montalbo's motion to strike the strike findings was denied, and he was sentenced to 25 years to life on each count with the sentences to run concurrently to one another and consecutive to a five-year determinate term for the serious felony enhancement.[3] The court struck the punishment for the prison prior. Mata was committed to state prison for a six-year term. Both of them timely filed notices of appeal.

## III. Discussion

### A. Sufficiency of the Evidence

Montalbo claims that neither count is supported by substantial evidence as to him. He claims that there was no evidence that he was the direct perpetrator or the aider and abettor of either assault with a deadly weapon and no evidence that assault with a deadly weapon was a natural and probable consequence of the simple assault that he committed. Mata contends that his conviction for assault with a deadly weapon on Smith is not supported by substantial evidence of his guilt as an aider and abettor or under a natural and probable consequences theory. He does not challenge his conviction for assault with a deadly weapon on Aana or the personal infliction enhancement.

### 1. Standard of Review

"The role of an appellate court in reviewing the sufficiency of the evidence is limited. The court must 'review the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence—that is, evidence which is reasonable, credible, and of solid value—such that a reasonable trier of fact

---

[3] Although the minutes reflect that the court imposed on Montalbo the five-year determinate term for the section 667, subdivision (a) enhancement, the abstract of judgment fails to include that term. We will direct the trial court to prepare an amended abstract correcting this clerical error.

10

could find the defendant guilty beyond a reasonable doubt.' [Citations.] [¶] The same standard applies to the review of circumstantial evidence. [Citations.] The court must consider the evidence and all logical inferences from that evidence . . . . But it is the *jury*, not the appellate court, which must be convinced of the defendant's guilt beyond a reasonable doubt. [Citation.] Therefore, an appellate court may not substitute its judgment for that of the jury. If the circumstances reasonably justify the jury's findings, the reviewing court may not reverse the judgment merely because it believes that the circumstances might also support a contrary finding." (*People v. Ceja* (1993) 4 Cal.4th 1134, 1138-1139.)

### 2. Montalbo

Montalbo assumes that the jury did not find him to be the direct perpetrator of the assault with a deadly weapon on Smith because the jury found the personal infliction of great bodily injury enhancement allegation not true. This assumption is invalid. A jury may make inconsistent findings. "Inconsistent findings by the jury frequently result from leniency, mercy or confusion. [Citation.] Such inconsistencies in no way invalidate the jury's findings." (*People v. York* (1992) 11 Cal.App.4th 1506, 1510.) Here, because Smith's injuries were much less serious than those of Aana, the jury may have believed that they did not amount to great bodily injury. Therefore, it cannot be assumed that the jury did not find Montalbo to be the direct perpetrator of the assault with a deadly weapon on Smith. Certainly there was sufficient evidence to support such a finding. Smith testified that only Mata and Montalbo were involved in the second fight with him. The only contact made by Mata with Smith was a single lunge, which Smith responded to by knocking Mata down. Montalbo, on the other hand, hit Smith numerous times, and Smith felt contact with his chest. Even more critically, a police officer saw Montalbo make a final punch to the center of Smith's upper chest that was the last contact anyone made with Smith before Smith discovered that he was bleeding from his chest. And Smith's blood was found on Montalbo's clothing. The jury could have reasonably

11

concluded from this evidence that Montalbo was the person who stabbed Smith in the chest and therefore was the direct perpetrator of the assault with a deadly weapon on Smith.

On the other hand, the jury clearly did not find that Montalbo was the direct perpetrator of the assault with a deadly weapon on Aana because it found that Mata had personally inflicted great bodily injury on Aana, who suffered a single stab wound. Thus, the jury must have concluded that Montalbo was guilty of assault with a deadly weapon on Aana under an aiding and abetting or natural and probable consequences theory.

"[A]n aider and abettor is a person who, 'acting with (1) knowledge of the unlawful purpose of the perpetrator; and (2) the intent or purpose of committing, encouraging, or facilitating the commission of the offense, (3) by act or advice aids, promotes, encourages or instigates, the commission of the crime.'" (*People v. Prettyman* (1996) 14 Cal.4th 248, 259.) The aider and abettor's act of aiding must be accompanied by knowledge and intent.

Montalbo does not claim that the evidence was insufficient to support a finding that his acts aided Mata's assault on Aana. He challenges the sufficiency of the evidence to support a finding that he knew that Mata had a knife. But no such knowledge was necessary for the jury to convict him of assault with a deadly weapon on Aana under a natural and probable consequences theory. "[U]nder the natural and probable consequences doctrine, an aider and abettor is guilty not only of the intended crime, but also 'for any other offense that was a "natural and probable consequence" of the crime aided and abetted.' [Citation.] Thus, for example, if a person aids and abets only an intended assault, but a murder results, that person may be guilty of that murder, even if unintended, if it is a natural and probable consequence of the intended assault." (*People v. McCoy* (2001) 25 Cal.4th 1111, 1117.) Even if Montalbo was unaware that Mata had a knife, he could be found guilty of assault with a deadly weapon for Mata's attack on

Aana if assault with a deadly weapon was a natural and probable consequence of an assault on Aana that Montalbo knowingly aided and abetted.

Montalbo's argument comes down to an assertion that the jury could not have concluded that assault with a deadly weapon on Aana was a natural and probable consequence of a simple assault on Aana. The jury was told that the test for a natural and probable consequence was "what a person of reasonable and ordinary prudence would have expected was likely to occur . . . in light of all of the circumstances surrounding the incident." That means that the likelihood that an assault with a deadly weapon would occur must be evaluated from the perspective of a reasonable person in Montalbo's shoes. Montalbo was the instigator of the initial fistfight during which Smith avoided Montalbo's attempt to punch him and knocked Montalbo down. Mata joined in but was no more successful than Montalbo. Smith and Aana simply walked away, and Montalbo, Mata, and the third man conferred with each other before racing after them. Because Montalbo used a weapon to stab Smith, the perspective of the reasonable person must be that of a person possessing a deadly weapon and instigating a second confrontation with a man who had already bested him. A reasonable person in that position, that is, one who plans to escalate a confrontation with a person from a fistfight to an assault with a deadly weapon in order to overcome a mightier opponent, would understand that his compatriots who have agreed to join him in combat are equally likely to use a weapon in the battle. Even if Montalbo did not *know* that Mata had a knife, he *should have known* under these circumstances that Mata was *likely to use a weapon* in the second confrontation.

### 3. Mata

Mata similarly contends that there was no evidence that he aided and abetted Montalbo's assault with a deadly weapon on Smith and no evidence that an assault on Smith with a deadly weapon was a natural and probable consequence of a renewal of the confrontation. We disagree for the same reasons we rejected Montalbo's similar claim. Since Mata possessed a deadly weapon and was willing to use it to escalate the

13

confrontation from a fistfight to an armed assault, he should have foreseen that his coparticipants were likely to do the same. Thus, Montalbo's assault with a deadly weapon on Smith was a natural and probable consequence of the confrontation that Mata aided and abetted.

## B.  Instructions and Responses to Jury Notes

Defendants contend that the court prejudicially erred in instructing the jury on aiding and abetting and natural and probable consequences because, in their view, the prosecution failed to present substantial evidence to support those theories. As we have already determined, there was substantial evidence to support these theories. Hence, we reject this contention.

Defendants argue that the trial court prejudicially erred in instructing the jury in CALCRIM No. 400 that an aider and abettor and the perpetrator are "equally guilty" and in responding to the jury's fifth note asking about that portion of the instruction.

The version of CALCRIM No. 400 given by the trial court, which provided the jury with general principles applicable to aiding and abetting, stated: "A person is [equally] guilty of the crime whether he or she committed it personally or aided and abetted the perpetrator who committed it."[4] CALCRIM No. 401 told the jury how to decide whether a defendant aided and abetted a crime. The court explicitly told the jury that, when the aiding and abetting instructions used "the term 'the crime' . . . it means the crime of ASSAULT with a DEADLY WEAPON." Consequently, the jury was fully informed that aiding and abetting was crime-specific. The jury's fifth note asked whether the "equally guilty" phrase meant that someone who committed a lesser offense could be found guilty of the greater offense based on aiding and abetting another defendant who

---

[4]    The current version of CALCRIM No. 400 no longer contains the "equally guilty" language.

14

committed the greater offense. The trial court's neutral response told the jury that it depended on what the jury found the facts to be and referred the jury back to CALCRIM No. 400.

We find no infirmity in the instruction or the trial court's response to the jury's note. The court's response to the jury, that the question of whether a defendant guilty of a lesser offense was liable for the greater offense depended on the facts, necessarily informed the jury that a defendant's guilt of a *lesser* offense did *not* make him "equally guilty" of the greater offense *unless* he was *also* an aider and abettor of the greater offense. In fact, this theme ran through all of the court's responses to the jury's notes. The court's response to the jury's fourth note told the jury that, "when deciding if a defendant is guilty as an aider and abettor of the charged crime refer to CALCRIM #401. When reading the term 'the crime' when referred to in elements #1 through #4 of CALCRIM #401 it means the crime of ASSAULT with a DEADLY WEAPON." The court's response to the jury's final note told the jury that a defendant could be found to be an aider and abettor of assault with a deadly weapon only if he knew that the perpetrator intended to commit an assault with a deadly weapon. Under these circumstances, the "equally guilty" language in former CALCRIM No. 400 could not have misled the jury to believe that it could find that a defendant who committed a lesser offense was guilty of the charged greater offense without finding that the defendant had aided and abetted the greater offense (or that the greater offense was a natural and probable consequence of the lesser offense).

This is not a case like *People v. Nero* (2010) 181 Cal.App.4th 504 (*Nero*) where the court's "equally guilty" instruction and other instructions misled the jury to believe that an aider and abettor to a killing could not be found guilty of a lesser offense (such as manslaughter) where the perpetrator committed murder. In *Nero*, it was possible that the aider and abettor had a less culpable mental state. Here, the court's instructions and responses to the jury's notes made clear that an aider and abettor was liable for an assault

with a deadly weapon committed by the perpetrator only if assault with a deadly weapon was the crime aided and abetted or assault with a deadly weapon was the natural and probable consequence of a simple assault aided and abetted.

## C. Criminal Justice Administration Fees

Defendants challenge the court's imposition of a "criminal justice administration fee" on each of them under Government Code section 29550.1, which allows a city to recover this fee when an arrestee is convicted. Neither of them challenged the imposition of these fees below. The Attorney General contends that defendants forfeited this contention by failing to challenge the fees below. In *People v. McCullough* (2013) 56 Cal.4th 589 (*McCullough*), the California Supreme Court held that "a defendant who fails to contest the booking fee when the court imposes it forfeits the right to challenge it on appeal." (*McCullough*, at p. 591.) The "booking fee" in *McCullough* was understood to have been imposed under Government Code section 29550.2, which allows a county to recover this fee when an arrestee is convicted. (*McCullough*, at p. 592.) Defendants do not respond to the Attorney General's forfeiture argument. As we see no basis for distinguishing *McCullough*, we find that defendants have forfeited this contention.

## IV. Disposition

The judgments are affirmed. The trial court is direct to prepare an amended abstract of judgment for Montalbo accurately reflecting the court's imposition of a five-year term for the section 667, subdivision (a) enhancement. The court shall send a certified copy of the amended abstract to the Department of Corrections and Rehabilitation.

16

_____
Mihara, J.

WE CONCUR:


_____
Premo, Acting P. J.


_____
Grover, J.

17