Filed 8/26/20  P. v. Bernal CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>       v.<br><br>ADAN BERNAL,<br><br>    Defendant and Appellant. | G058016<br><br>(Super. Ct. No. 13NF4299)<br><br>O P I N I O N |

Appeal from a judgment of the Superior Court of Orange County, John Conley, Judge.  Affirmed.

Erica Gambale, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Daniel Rogers and Christopher P. Beesley, Deputy Attorneys General, for Plaintiff and Respondent.

## INTRODUCTION

Appellant Adan Bernal was convicted by a jury of first degree residential burglary based solely on DNA discovered on the handle of the door believed to have been used to gain entry to the home. On appeal, he contends this evidence alone was insufficient to support a conviction. We disagree, find this evidence was indeed sufficient, and therefore affirm.

## FACTS

The following facts were adduced at trial: On the afternoon of November 24, 2012, Carol Marzolo returned to her Buena Park home after spending some time at her mother's house. Her husband, Danny, and their daughter had gone to Barstow on a waterskiing trip and the house was empty. From the beginning, the house seemed a bit peculiar. As Carol entered, she noticed the deadbolt on the door leading from the garage to the house was unlocked. It was usually locked.[1] She went up to her bedroom. There she saw her credit cards lying on top of her dresser, as if someone had gone through them.

Suspicious, she checked the master closet where she had a built-in jewelry box. The top drawer was open. In it, she usually kept a piece of gold jewelry from her mother-in-law wrapped up in a floral napkin. This time, however, the napkin was hanging out of the drawer and the gold was nowhere to be seen. She then saw that another locked drawer in the closet had been broken into.

Carol turned around to check the area where she and Danny usually kept their safe. The safe contained cash, dividend checks, pink slips, bonds, birth certificates, and all of the couple's important paperwork. It would normally be underneath their laundry basket. It had disappeared.

---

[1] Danny testified the garage door had indeed been locked when he and his daughter left for Barstow.

Immediately, Carol called Danny to ask whether he had taken the safe with him for some reason, but he didn't know what she was talking about. She knew then their home had been burglarized, and she called the police.

While she waited, she decided to see if she could figure out where the intruder had entered. She noticed the wood on the side door, one of three doors leading into the house, had been chipped away. It looked as though the door had been jimmied. The door hadn't looked that way prior to her departure; in fact, all of the doors had been locked. But when she returned home, only the front door was still locked.

The side door was not a high-traffic entry or exit point – its only use was by family members and an occasional invited guest. It was not visible from the street, and in order to access it from outside the property, one would have to get past a fence. Carol surmised the intruder had "jumped the fence" in order to get to the door.

After she arrived at the Marzolo home, Tara Alfonzo, a forensic specialist with the Orange County Crime Lab (the "Crime Lab"), began a walk-through of the home to gauge where she could best collect evidence. The police officer first on the scene took her to the side door as the presumed point of entry. The door was still locked, but open. She noticed scrape marks to the exterior of the door consistent with a forced entry. She was taken upstairs to the master bedroom where she observed the open closet drawers and items on top of the dresser.

Alfonzo dusted for fingerprints on the side door and in the master bedroom, but she was unable to find any. She also swabbed three places for DNA evidence - the exterior handle of the side door, the floral napkin in the master closet, and one of the closet drawers that had been forced open.[2] For elimination purposes, DNA samples were obtained from Carol, and later, from Danny and their daughter.

---

[2]     Alfonzo testified that three swabs was the baseline number allowed by the Crime Lab for submission of samples for analysis. However, she confirmed she was not required to take a minimum or maximum of three samples – she has in the past taken more or less as necessary.

Only the side door handle swab yielded DNA with an unknown profile. It was a small sample, but it showed one major contributor and multiple minor contributors of DNA, the latter of whom could not be profiled. The low level of the sample indicated there was not a lot of DNA on the handle, and it was likely touch trace DNA rather than DNA from a bodily fluid. There was no way to tell how long the DNA had been on the handle. However, as Alfonzo testified at trial, DNA can degrade over time, especially when exposed to the elements.

The major contributor provided 85 percent of the DNA to the sample. And because the contributor's profile was male, the Crime Lab compared only Danny's DNA against the sample. It did not match.

Over a year after the burglary occurred, the Crime Lab received a DNA sample from appellant.[3] Appellant's sample was compared to the DNA found on the door handle, and it was consistent with the major contributor, which meant he could not be excluded. Carol and Danny did not know or recognize appellant and did not know why he would have been at their home.

On December 10, 2013, a felony complaint was filed against appellant, containing a single count of first degree residential burglary (Pen. Code, §§459, 460, subd. (a)) with three prior convictions of burglary. At trial[4], Danielle Wieland, a forensic scientist in the Crime Lab, testified that there was a one in 60 billion chance of choosing an individual at random who could not be excluded as the major contributor of the DNA sample on the side door handle.

Appellant did not testify in his own defense. Instead, he presented testimony from Marc Taylor, a forensic scientist and expert in DNA analysis. Taylor noted that the DNA sample collected from the door handle was so small that there was a

---

[3]    The record is unclear as to the circumstances under which appellant was identified as a potential suspect in the burglary.

[4]    Evidence of the prior convictions did not come in at trial.

danger of a profiling error. On cross-examination, he admitted he did not find any actual errors in the testing and agreed that DNA is generally reliable evidence.

Wieland and Taylor also testified regarding the possibility of secondary transference – a phenomenon in which one individual's DNA is indirectly transferred to a surface by another person. Wieland testified about independent studies she has conducted in the Crime Lab on the phenomenon. These studies found it possible to transfer DNA without the initial contributor's physical presence at the site of transference, but the person transferring the DNA to the surface would leave his or her own DNA profile as well. Moreover, major contributors of DNA would be harder to detect on an object the more it was handled. In this case, only appellant's profile was identifiable.

Taylor acknowledged reviewing Wieland's studies, and opined that secondary transference occurred in a fairly high number of the cases therein. However, on cross-examination, he conceded one could expect to see less and less of the original contributor's DNA transferred each time the recipient of the DNA touched surfaces and objects.

The jury returned a guilty verdict, and appellant was sentenced to four years in prison.

**DISCUSSION**

Where the challenge to a criminal conviction is based on insufficiency of the evidence, we are to "review the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence – that is, evidence which is reasonable, credible, and of solid value – such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." (*People v. Johnson* (1980) 26 Cal.3d 557, 578.) "The same standard applies to the review of circumstantial evidence." (*People v. Ceja* (1993) 4 Cal.4th 1134, 1138.) A reviewing court is not to substitute its judgment for that of the jury, and thus, our inquiry is limited to determining

5

whether "the circumstances reasonably justify the jury's findings." (*Id*. at p. 1139.) We find they do.

First degree burglary of an inhabited residence requires entry with the intent to commit theft or another felony. (See Pen. Code, §§459, 460, subd.(a).) "As burglary is a crime of stealth, dependence must be placed in most cases upon circumstantial evidence." (*People v. Jordan* (1962) 204 Cal.App.2d 782, 786.) Thus, it is not "necessary 'in order to establish the defendant's guilt, that any of the witnesses should have actually seen him break and enter the premises, or should have seen him in the vicinity of the premises about the time the burglary was committed[.]'" (*People v. Murphy* (1959) 173 Cal.App.2d 367, 373, quoting *People v. Flynn* (1887) 73 Cal. 511, 513.)

Here, the jury heard circumstantial evidence which, taken together, could reasonably establish all of the elements of burglary against appellant. An intruder had forced an inconspicuous and rarely used door to the Marzolos' home open and absconded with jewelry and the couple's safe. The door was not publicly accessible. The DNA sample obtained from the outside handle of that very door contained a relatively large amount of appellant's DNA. While Mr. Taylor raised some concerns about the size of the DNA sample used to identify appellant as the suspect, he could not find any actual errors in the Crime Lab's test results.

Appellant emphasizes the "DNA only" nature of this case. We agree that a conviction hinging on a single piece of evidence is theoretically more troubling than a conviction based on multiple pieces of evidence. This concern was raised – rightly, we believe – in the "fingerprint only" cases upon which appellant relies for this point. In *Birt v. Superior Court* (1973) 34 Cal.App.3d 934 (*Birt*), for example, the only evidence linking the female defendant to the burglary was a lone fingerprint found on a cigarette lighter inside a rental van used by two *male* suspects during the crime. (*Id.* at p. 937.) The lighter, a *movable* object, was not taken from the burgled premises and defendant's

6

fingerprints were not found there or on any recovered stolen property. (*Id.* at p. 938.) Meanwhile, other fingerprints found on objects in the van were never identified. (*Ibid.*) The Third District Court of Appeal found "it appalling" that appellant was "being prosecuted on so scanty a record." (*Id.* at p. 937.)

Similarly, in *Mikes v. Borg* (9th Cir. 1991) 947 F.2d 353 (*Mikes*), the owner of a fix-it shop was believed to have been murdered by burglars using disassembled components of a store turnstile the victim had purchased four months earlier in a hardware store's going-out-of-business sale. (*Id.* at pp. 355-356.) Of a total of 46 fingerprints lifted from the crime scene, police were able to identify only 16, 6 of which belonged to the appellant, Mikes. (*Id.* at p. 355.) Mikes' fingerprints were only found on the turnstile components and not anywhere else at the scene. (*Id.* at p. 356.) The prosecution's case "rested exclusively," therefore, on prints found on a *movable* object. (*Id.* at p. 355.)

Mikes' expert "testified that fingerprints can last indefinitely." (*Id.* at p. 358.) Because the turnstile had been in a public place prior to the victim's purchase, and because it had remained in his private basement thereafter, the fingerprints on it could have been left prior to the purchase. (*Id.* at pp. 358-359.) The Ninth Circuit Court of Appeals was unwilling to "establish a precedent that would permit" a person to be convicted simply because he or she had touched an object found at the scene of a crime. (*Id.* at p. 361.) Instead, the court found that fingerprint only convictions must be supported by evidence permitting the inference "that the fingerprints were in fact impressed at that time and not at some earlier date." (*Id.* at pp. 356-357.) In practical terms, this requires evidence "sufficient to permit the jury to conclude that the objects on which the fingerprints appear were inaccessible to the defendant prior to the . . . commission of the crime." (*Id.* at pp. 356-357.)

This case presents just such a scenario – a set of facts that satisfies both *Birt* and *Mikes*. The DNA was discovered on an immovable object – a door handle – attached

7

to the jimmied door. The door was located behind a fence and was not visible from the street. Because DNA would tend to degrade over time, the presence of appellant's DNA would reasonably suggest to a juror that he had recently come in contact with the door handle. Appellant was a stranger to the Marzolo home, and the jury reasonably inferred he forced the door open.

Indeed, this case more closely resembles two other cases that have discussed and distinguished *Mikes*. (See *Taylor v. Stainer* (9th Cir. 1994) 31 F.3d 907 (*Taylor*); *People v. Johnson* (2019) 8 Cal.5th 475, mod. 8 Cal.5th 1037a (*Johnson*).) In *Johnson*, the California Supreme Court ruled that it was proper to introduce a fingerprint on a gun clip as aggravating evidence of violent conduct. (*Id.* at pp. 514-517.) In that case, the defendant had been convicted of murdering the gun's owner and was suspected of later using the gun in a rape and assault occurring only days after the murder. (*Id.* at pp. 482-483.) The fingerprint was the sole piece of evidence implicating defendant in the rape and assault. (*Id.* at p. 514.) Defendant argued that this evidence was insufficient "because the gun clip was a movable object." (*Id.* at p. 515.) The high court disagreed, noting that, unlike *Mikes*, "there was no evidence the magazine was accessible to the general public before the" rape and assault occurred. (*Id.* at p. 516.)

In *Taylor*, the defendant was found guilty of felony murder because his fingerprint was found on the sill of the point of entry window into the victim's apartment. (*Id.* at p. 908.) The court distinguished *Mikes* in much the same way we do, stating: "To hold that the evidence against Taylor was insufficient, we would have to extend *Mikes* to cover fingerprints that are found in places or on objects that were never accessible to the general public and that can be explained in a manner consistent with innocence only through far-fetched, unsupported speculation. This we decline to do." (*Id.* at pp. 909-910.)

As do we. The Marzolos' side door was not generally accessible or visible to the public. As a stranger to the home, appellant had to provide a plausible explanation

as to how his DNA may have gotten on the door handle.  Yet his secondary transference theory never grew beyond "far-fetched, unsupported speculation."  (See also *People v. Preciado* (1991) 233 Cal.App.3d 1244, 1247 [noting that the prosecution need not negate all inferences consistent with innocence so long as "[e]nough inferences were negated"].)  Appellant's expert suggested it only as a nebulous possibility and appellant never fashioned it into a credible alternative scenario for the jury.

For this reason, we must also reject appellant's contention the DNA evidence merely raised a suspicion as to his guilt.  Once again, appellant cites cases that undercut his position.

In *People v. Trevino* (1985) 39 Cal.3d 667, defendant's fingerprints inside the home of a murder victim did not substantially incriminate him because he had been a guest in the home before and could potentially have left prints prior to the crime.  (*Id.* at pp. 696-697.)  So there was a credible alternative explanation as to how they got there.

In *People v. Briggs* (1967) 255 Cal.App.2d 497, the defendant's only connection to the burglary was the presence of his wallet near the point of entry.  Defendant explained he had lost his wallet a few weeks prior to the burglary.  (*Id.* at p. 499.)  Again, there was a credible alternative explanation as to how the wallet got there.

In *People v. Redmond* (1969) 71 Cal.2d 745, a television salesman's fingerprint was found on a windowsill inside the burgled premises, but it did not substantially incriminate him because he had been inside the house the day before the crime to sell the homeowners a new TV and recalled touching the windowsill during that conversation.  (*Id.* at pp. 752, 756-757.)  By now, what we would say about the existence of a credible alternative explanation seems unnecessary.

## DISPOSITION

The judgment is affirmed.


                                                   BEDSWORTH, ACTING P. J.

WE CONCUR:


IKOLA, J.


THOMPSON, J.