Filed 10/18/22  In re J.T. CA2/6

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SIX

| | |
|---|---|
| In re J.T., a Person Coming Under the Juvenile Court Law. | 2d Juv. No. B314411 (Super. Ct. No. YJ39216) (Los Angeles County) |

THE PEOPLE,

    Plaintiff and Respondent,

v.

J.T.,

    Defendant and Appellant.

J.T. appeals from the judgment entered after the juvenile court sustained a petition filed pursuant to Welfare and Institutions Code section 602.  The court found true an allegation that he had committed murder.  It determined the murder to be of the first degree, i.e., willful, deliberate, and premeditated. (Pen. Code, §§ 187, subd. (a), 189, subd. (a).)  The court

committed appellant to the Division of Juvenile Justice. It fixed his maximum period of confinement at 25 years to life.

Appellant contends that the evidence is insufficient to show that he shot the victim. We affirm.

*Facts*

The murder and subsequent events were recorded by video surveillance cameras. At 3:59 p.m., Derald Loadholt parked his Mercedes on Western Avenue in the City of Los Angeles. A BMW had been following the Mercedes. The BMW stopped next to the driver's side of the parked Mercedes. The BMW's front passenger was "wearing a red top" or a "red hoodie."

The front passenger window of the BMW was partially open. Video footage showed "a hand extending out the [front passenger] window" of the BMW and "glass [in the Mercedes] shattering and breaking." The BMW drove away.

Five bullets had struck the driver's side of the Mercedes. Loadholt died from a gunshot wound to the head. Three 9-millimeter casings were found at the crime scene.

The BMW drove to 6411 8th Avenue and arrived there at 4:04 p.m., five minutes after the shooting. The distance between the crime scene and this address is about two miles. An officer who had "driven from the crime scene to that address" estimated that it would take approximately six minutes to make the drive in "normal . . . daytime traffic."

When the BMW arrived at the location, Alon Hunt got out of the rear passenger seat and walked to a security gate. The gate led to an apartment complex were Hunt lived. Hunt opened the gate, and the BMW drove into the driveway. Hunt was wearing a gray sweatsuit.

The BMW came to a stop. The driver and front passenger got out of the vehicle. The driver, Deshon Womack, was wearing "a dark shirt [with] a white Nike logo." The front passenger, appellant, was wearing "a red hoodie."

Appellant concedes that he "was the front passenger when it [the BMW] arrived at Hunt's apartment shortly after the shooting . . . ." Appellant further concedes, "Shortly after the shooting, he was seen in front of the apartment complex . . . wearing a red hoodie and leaving the car that was used in the driveby shooting."

All three occupants of the BMW were members of a criminal street gang – the Rollin' 90 Neighborhood Crips. A gang expert testified that gang members "want to be respected . . . within the [gang] culture. The best way to gain that sort of respect is committing acts of violence." The shooting occurred in the territory of a rival gang – the Eight-Tray Gangster Crips. According to the expert, "the Eight-Tray Gangster Crips . . . are enemies of the Rollin' 90s." "Every criminal street gang . . . [has] mortal enemies they will frequently fight with, and on occasion, shoot and kill."

Approximately six to seven weeks before the shooting, appellant agreed to purchase a 9-millimeter Ruger semiautomatic handgun. Appellant apparently completed the purchase because an officer "found a photo of him with what appears to be that same handgun." The photo was dated two days after appellant had agreed to purchase the firearm.

*Substantial Evidence Supports the Murder Conviction*

"The same standard governs review of the sufficiency of evidence in adult criminal cases and juvenile cases . . . ." (*In re Matthew A.* (2008) 165 Cal.App.4th 537, 540.) "The court must

3

'review the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence—that is, evidence which is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.'" (*People v. Ceja* (1993) 4 Cal.4th 1134, 1138.)

Appellant contends: "The central weakness in the case against [him] is that the evidence presented by the prosecution fails to place [him] in the vehicle from which the fatal shots were fired at the time of the shooting." "The prosecution proved that the front passenger in Womack's vehicle shot Loadholt but failed to establish that appellant was that passenger."

We disagree. Substantial evidence supports a finding that appellant was inside the BMW at the time of the shooting and that he was the shooter. The shooter was in the front passenger seat and was "wearing a red top" or a "red hoodie." Minutes after the shooting, appellant got out of the front passenger seat when the BMW arrived at Hunt's residence. Appellant was the only occupant of the vehicle wearing a red hoodie. He acknowledges: "The video was consistent with driving directly from the crime scene to Hunt's residence."

Appellant had a motive to commit the shooting. The motive was to gain the respect of fellow gang members. A gang expert testified that the best way for a gang member to gain respect within the gang is to commit acts of violence. Appellant concedes, "The prosecution . . . introduced gang evidence to show that he had a motive, of sorts, to kill [Loadholt], i.e., to elevate the reputation of the gang and his own reputation."

Moreover, the shooting occurred in an enemy gang's territory. It is reasonable to infer that appellant committed the

4

shooting because he believed Loadholt was a member of or associated with the rival gang. After the occupants had exited the BMW at Hunt's residence, video footage showed appellant "appear to shake hands with Mr. Hunt." This could be interpreted as a congratulatory handshake. An officer who had viewed the video testified: "[Appellant] at one point does a dance; appears to be doing some sort of a dance. Celebratory dance, I'd categorize it, describe it. And they appear to be laughing, smiling." Appellant asserts, "[T]here is video footage of the whole group coming out of Hunt's apartment [after the shooting]. It is at that point that appellant executes a little dance."

Finally, it is reasonable to infer that, about six to seven weeks before the shooting, appellant purchased the 9-millimeter firearm used in the shooting. We know that a 9-millimeter firearm was used because officers recovered three 9-millimeter casings at the crime scene. Before the shooting, appellant was photographed with a 9-millimeter handgun in his possession. Appellant acknowledges, "Evidence indicated that [he] owned a 9mm handgun . . . ."

Appellant notes that, after the BMW had arrived at Hunt's residence, video footage showed "there was another person walking toward Hunt's door in a red hoodie." An officer testified: "There's another individual. . . . There's an individual wearing a red hoodie and he's walking towards the front door of Mr. Hunt's apartment." The other person "wearing a red hoodie" had not exited the BMW after the shooting. Appellant was the only occupant of the BMW wearing a red hoodie when it arrived at Hunt's residence, and he exited the front passenger side where the shooter had been seated. Thus, the presence of another

5

person wearing a red hoodie at Hunt's residence does not weaken the prosecution's case.

Appellant claims there is "strong evidence that it was physically impossible for appellant to have been in Womack's vehicle at the time of the shooting" because his cell phone was not in Womack's vehicle at that time. Appellant's cell phone was in the area of Jesse Owens Park (the Park) on South Western Avenue until approximately 4:04 p.m. The distance between the Park and the crime scene is approximately 1.8 miles. The cell phone traveled through the area of the crime scene between 4:09 and 4:12 p.m. The shooting occurred at 3:59 p.m. The cell phone traveled to the area of Hunt's residence on 8th Avenue at approximately 4:15 p.m. and remained there until at least 4:59 p.m.

There is no "physical impossibility" here. At the time of the shooting, another person must have possessed appellant's cell phone. If appellant had possessed it, his cell phone records would have shown that it had reached Hunt's residence at 4:04 p.m. when appellant arrived there. Instead, the cell phone records showed it had reached Hunt's residence at approximately 4:15 p.m.

It is reasonable to infer that, at the time of the shooting, J.L. possessed appellant's cell phone. Appellant and J.L. were members of the same criminal street gang. At 3:58 p.m., one minute before the shooting, appellant's cell phone took photos of J.L. at the Park. An officer testified that, after the BMW had arrived at Hunt's residence, video footage showed "[J.L.] hand[] [appellant] a small rectangular object" that "[a]ppeared to [be] consistent with a cell phone."

6

*Disposition*

The judgment is affirmed.

<u>NOT TO BE PUBLISHED.</u>

YEGAN, J.

We concur:

GILBERT, P. J.

BALTODANO, J.

7

Sabina A. Helton, Judge

Superior Court County of Los Angeles

_____

Lynette Gladd Moore, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Senior Assistant Attorney General, Scott A. Taryle, Supervising Deputy Attorney General, Stefanie Yee, Deputy Attorney General, for Plaintiff and Respondent.