Filed 7/21/25  P. v. Montano CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA


| | |
|---|---|
| THE PEOPLE, | D082692 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. SCD274475) |
| GLEN MONTANO, | |
| Defendant and Appellant. | |


APPEAL from a judgment of the Superior Court of San Diego County, Eugenia A. Eyherabide, Judge.  Affirmed.

Patricia J. Ulibarri, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, Steve Oetting and Daniel J. Hilton, Deputy Attorneys General, for Plaintiff and Respondent.

# I. INTRODUCTION

Glen Montano[1] appeals from his first degree murder conviction, challenging the jury's lying-in-wait special circumstance finding. He claims that decision was not supported by substantial evidence, and the jury instructions did not distinguish the special circumstance from premeditated first degree murder. Finding no merit to either of these claims, we affirm.

# II. BACKGROUND

In 2020, Montano operated a gambling room out of his garage. Montano lived with his brother, Alfredo Montano.[2] Joshua Barnum and Leaoaisemati Sandoval worked in the gambling room.

The entrance for the gambling room was on the side of the garage, where patrons would ring a doorbell outside a gate and await permission for entry. Surveillance cameras positioned at this entrance, as well as inside the garage, captured the following incident.

On June 5, 2020, at approximately 4:00 in the morning, Sean Nixon went to the gambling room. After about 40 minutes, during which time he repeatedly smoked methamphetamine, Nixon attacked Sandoval. Sandoval oversaw the gambling room's money, and Nixon attempted to steal her fanny pack. Montano came to Sandoval's aid and after a struggle they were able to eject Nixon from the garage.

Nixon attempted to gain reentry moments later. He rang the doorbell at the gate outside the garage and waited for several minutes. Meanwhile,

---

[1]     Montano's first name is spelled two different ways in the record:  "Glen" and "Glenn."  We follow the spelling used by Montano.

[2]     We refer to Alfredo Montano by his first name for clarity.  No disrespect is intended.

Barnum and Robert Garcia arrived at the Montano house on the opposite side of the garage. They were met by Montano, and all three walked to the other side of the garage where Nixon stood, and conversed with Nixon for about six minutes.[3] During that time, Nixon appears to make a phone call or calls. Alfredo joined Barnum, Garcia, and Montano in the driveway and had a brief conversation with Montano out of Nixon's view. Alfredo then walked through the house and emerged from the garage gate holding a hatchet. All five men then calmly walked into the garage.

Once in the garage, Nixon stood with Barnum and Sandoval to his left, and Montano to his right. Nixon looked to his left as he argued with Barnum and Sandoval about his attempted robbery of Sandoval. Nixon also looked to his right, briefly conversing with Montano. After moving to the middle of the garage to retrieve a power cord, Nixon stood facing Sandoval, Barnum, and Montano. Nixon returned to his original position, and after a few minutes, turned his back to Montano. Nixon had been in the garage for 11 minutes at this point. Although he argued with Sandoval and Barnum and invoked his gang, Skyline Piru, Nixon appeared calm the entire time, sucking on a lollipop.

After Nixon turned his back to Montano, Alfredo walked from behind Nixon and as soon as Alfredo stepped passed Nixon, Montano approached Nixon from behind and wrapped a strap around Nixon's neck. Nixon was in the process of putting his lollipop in his mouth. Montano yanked Nixon down with the strap, and Alfredo immediately turned around and grabbed the lower portion of Nixon's body. Barnum joined the scuffle, delivering five punches to Nixon's head and body as Nixon exclaimed, "are you kidding

---

[3]     The surveillance footage from outside the garage did not have any sound.

blood[?]" Alfredo then punched Nixon numerous times, kicking Nixon three times after he fell to the floor.

Montano dragged Nixon by the strap into the middle of the garage where Nixon laid on his back while Alfredo stepped on Nixon's chest. Alfredo and an unidentified individual instructed others to lock the door, and Vernon Ramos laid a tarp down next to Nixon's body.

Montano then stepped on Nixon's neck, continuing to pull on the strap, and Alfredo patted down Nixon's front pants pockets. Barnum took Nixon's phone, reached over Nixon's body to give Montano a fist bump, and left. Barnum discarded Nixon's phone in an alley trashcan after looking through it for calls and texts.

Montano obtained a trash bag from Sandoval, put it over Nixon's head and left arm, and then wrapped the strap over the bag and around Nixon's neck. Moments later, Montano grabbed a book and pressed it down on Nixon's face. After strangling and suffocating Nixon for 10 minutes, Montano covered Nixon's body with the tarp that Ramos had laid down.

Police executed a search warrant at the Montano house about 24 hours after the murder and found Nixon's body. A medical examiner determined that Nixon died from strangulation and suffocation, with blunt head trauma contributing. Nixon was 5 feet 10 inches tall, he weighed 237 pounds, and he had PCP, methamphetamine, alcohol, and marijuana in his system. At the time of his arrest, Montano weighed 150 pounds at 5 feet 7 inches tall.

In 2023, the San Diego District Attorney's Office charged Montano, Barnum, Alfredo, and Sandoval with Nixon's murder (Pen. Code, § 187, subd. (a); count 1), alleging that Montano and Alfredo killed by means of lying in wait (Pen. Code, § 190.2, subd. (a)(15)).

4

At the four defendants' 2023 trial, the court admitted the surveillance footage depicting the murder. Montano called a forensic toxicologist and former drug addict who testified about the effects of ingesting narcotics. Montano also presented testimony from several friends who described his background, two witnesses that described Nixon's prior misdeeds, and a restraining order Nixon's father had obtained against Nixon. A gang expert also testified on Montano's behalf, stating that the Montanos' home was in Skyline Piru territory, and that Nixon was a known member of that gang.

Testifying in his own defense, Barnum denied any intent or plan to kill Nixon. Barnum told the jury that when Nixon and the others were talking outside, Montano suggested that everyone go inside the garage. Barnum and Montano were worried about drawing unwanted attention to the gambling room, but no one ordered Nixon inside. Barnum knew of Nixon's aggressive and disruptive reputation and that Nixon had gang tattoos. Barnum also testified that he and Montano were using methamphetamine around the time of the murder.

The People prosecuted Montano for willful, deliberate, and premeditated first degree murder.[4] Pursuant to CALCRIM No. 521, the trial court instructed the jury that "[t]he defendant acted *willfully* if he or she intended to kill. The defendant acted *deliberately* if he or she carefully weighed the considerations for and against his or her choice and, knowing the consequences, decided to kill. The defendant acted with *premeditation* if he or she decided to kill before completing the acts that caused death."

---

[4] In his opening brief, Montano incorrectly asserted the People also sought to convict him of lying-in-wait first degree murder. Montano acknowledged the error in his reply brief and withdrew any related argument.

As for the lying-in-wait special circumstance, the trial court used CALCRIM No. 728. The trial court informed the jury that "[a] person commits a murder by means of lying in wait if: [¶] 1. He or she concealed his or her purpose from the person killed; [¶] 2. He or she waited and watched for an opportunity to act; [¶] 3. Then he or she made a surprise attack on the person killed from a position of advantage; [¶] AND [¶] 4. He or she intended to kill the person by taking the person by surprise." The trial court further explained that "[t]he lying in wait does not need to continue for any particular period of time, but its duration must be substantial and must show a state of mind equivalent to deliberation or premeditation."

The jury found Montano, Alfredo, and Barnum guilty of first degree murder, with the lying-in-wait special circumstance true as to Montano but not Alfredo. The jury was not able to reach a verdict regarding Sandoval, and the trial court declared a mistrial as to her. The trial court sentenced Montano to life in prison without parole. Montano appealed.

## III. DISCUSSION

A.    *Substantial Evidence Supports the Lying-in-wait Special Circumstance*

    1.    Standard of Review

When a defendant challenges the sufficiency of the evidence, " ' "we review the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence—that is, evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." ' " (*People v. Holmes, McClain and Newborn* (2022) 12 Cal.5th 719, 780.) We do " ' "not reweigh the evidence, evaluate the credibility of witnesses, or resolve evidentiary conflicts." ' " (*People v. Helzer* (2024) 15 Cal.5th 622, 646.)

6

2.    The Lying-in-wait Special Circumstance

The lying-in-wait special circumstance requires proof of " ' " ' "an intentional murder, committed under circumstances which include (1) a concealment of purpose, (2) a substantial period of watching and waiting for an opportune time to act, and (3) . . . a surprise attack on an unsuspecting victim from a position of advantage." ' " ' " (*People v. Woodruff* (2018) 5 Cal.5th 697, 774.)

Regarding the first element, "[t]he required concealment need not be physical.  It suffices if the defendant's purpose and intent are concealed by his actions or conduct, and the concealment of purpose puts the defendant in a position of advantage, from which the fact finder may infer that lying in wait was part of the defendant's plan to take the victim by surprise." (*People v. Ceja* (1993) 4 Cal.4th 1134, 1140.)

"As for the watching and waiting element, the purpose of this requirement 'is to distinguish those cases in which a defendant acts insidiously from those in which he acts out of rash impulse.  [Citation.]  This period need not continue for any particular length " 'of time provided that its duration is such as to show a state of mind equivalent to premeditation or deliberation.' " ' " (*People v. Mendoza* (2011) 52 Cal.4th 1056, 1073.)  "[A] few minutes can suffice." (*People v. Moon* (2005) 37 Cal.4th 1, 23.)

Finally, a surprise attack from a position of advantage can be inferred when a defendant attacks a victim from behind without warning.  (See, e.g., *People v. Flinner* (2020) 10 Cal.5th 686, 751; *People v. Combs* (2004) 34 Cal.4th 821, 853.)

3.    Analysis

Montano does not dispute that he intentionally killed Nixon, and the footage depicting Montano's ten-minute asphyxiation of Nixon clearly

satisfies that requirement. As for the other elements, it was Montano who suggested that Nixon return to the garage, where he would be outnumbered in a confined space. Nixon also appears to have reentered the garage voluntarily, showing no indication of a perceived threat as he conversed with Montano and the other occupants. Meanwhile, Montano stood in the corner of the garage, at some point arming himself with a strap. Montano waited 11 minutes, and when Nixon turned his back for the first time, Montano launched his attack from behind, which appeared to be coordinated with Alfredo. Nixon was clearly surprised. He was putting his lollipop in his mouth at the time and then gasped, "are you kidding blood[?]" Under these circumstances, a reasonable jury could find that Montano concealed his purpose, watched and waited for a substantial period for an opportune time to act, and attacked Nixon by surprise from a position of advantage.

Arguing that he acted in haste and frustration, Montano points to Nixon's reputation, gang affiliation, intoxication, aggressive behavior, and larger size. Montano also argues that Nixon knew he was unwanted and in a hostile environment, and the group only reentered the garage because they were worried about noise. But Nixon's characteristics, as well as concerns for noise, could support Montano's decision to strangle Nixon by surprise. And despite the agitation between Nixon and the other gambling room occupants, as noted above, Nixon's actions show he was not suspecting the attack.

Montano further contends that this was not a classic watching and waiting case, citing the facts from numerous other cases. However, "[b]ecause each case necessarily depends on its own facts, and because [Montano's] conduct clearly satisfied each of the lying-in-wait requirements, the attempt to contrast this case with others falls short." (*People v. Mendoza, supra*, 52 Cal.4th at p. 1075.)

8

Finally, Montano supports his argument with the trial court's dismissal of the lying-in-wait special circumstance at the preliminary hearing. This is unpersuasive under the substantial evidence standard. " ' " ' " 'If the circumstances reasonably justify the trier of fact's findings, the opinion of the reviewing court,' " ' " ' " or any other court, " ' " ' " 'that the circumstances might also reasonably be reconciled with a contrary finding does not warrant a reversal of the judgment.' " ' " ' " (*People v. Jones* (2013) 57 Cal.4th 899, 961.)

Based on the foregoing, substantial evidence supported the jury's true finding on the lying-in-wait special circumstance.

B.     *The Lying-in-wait Special Circumstance Instructions Were Distinct from the Premeditated First Degree Murder Instructions*

Montano argues that CALCRIM Nos. 521 and 728 did not adequately explain the difference between premeditated first degree murder and the lying-in-wait special circumstance because both instructions required a state of mind equivalent to premeditation and deliberation.

However, as Montano acknowledges, the California Supreme Court has rejected this argument (*People v. Stevens* (2007) 41 Cal.4th 182, 203–204), and we are bound to follow that precedent (*People v. Meneses* (2019) 41 Cal.App.5th 63, 68).[5] "In distinction with premeditated first degree murder, the lying-in-wait special circumstance requires a physical concealment or concealment of purpose and a surprise attack on an unsuspecting victim from a position of advantage." (*Stevens,* at p. 203.) We therefore see no error.

---

[5]     Montano "raise[d] the matter with a view toward our Supreme Court revisiting the issue."

9

## IV. DISPOSITION

The judgment is affirmed.

RUBIN, J.

WE CONCUR:

DO, Acting P. J.

CASTILLO, J.